[Crim. No. 3325. First Dist., Div. One. Feb. 18, 1958.]

THE PEOPLE, Respondent, v. THOMAS B. DAILY et al., Appellants.

Dennis L. Woodman for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Marvin A. Christiansen, Deputy Attorney General, for Respondent.

WOOD (Fred B.), J.—Convicted of abortion and of conspiring to commit abortion (Pen. Code, §§ 274 and 182), defendants appeal from the judgment and from the denial of their motions for new trial.

The testimony of the prosecuting witness, if sufficiently corroborated, furnishes adequate support for each verdict. There was medical evidence that an abortion had been performed.

Finding herself pregnant she requested her doctor for an abortion but he refused, deeming it unnecessary for the preservation of her life. Later, through a friend, she contacted defendant Poitevent who put her in touch with defendant Daily. He performed a packing operation and gave her some post-operative care, all at her home. Miscarriage occurred on the ninth day. Daily gave her shots the next day and again about three weeks later. Then she had a hemorrhage and went to a hospital. There the police contacted her and told her to let them know if Daily called again. Daily phoned later and by appointment came to see her at her home, where the police arrested him.

(1) *Daily questions the legality of the seizure of certain instruments, medicines and materials used or useful in performing abortions.*

■ Some of these objects were in a bag which the officers found in the trunk of Daily's car. They had just arrested him, without a warrant, at the home of the prosecuting witness; legally so, because the information she gave them furnished reasonable cause to believe that he had committed a felony. (See Pen. Code, § 836.) Searching him they found a key to his car which he told them was parked in the street, 50 to 60 feet distant. The search of the car was legal as reasonably incident to the arrest. A man's automobile, unlike his house, is a mobile object and the need for immediate search is deemed that much the greater. (See *Carroll* v. *United States,* 267 U.S. 132, 153 [45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790]; *United States* v. *Cefaratti,* 202 F.2d 13.)

■ The other similar objects seized were found in Daily's apartment while the officers were engaged in executing a search warrant. Daily claims the warrant defective for failure of the magistrate to "insert a direction in the warrant" as to when it must be served, in the daytime or at any time of day or night (Pen. Code, § 1533). We do not deem the omission of such a direction fatal when, as in this case, the warrant is served in the daytime. (See *Johnson* v. *United States,* 46 F.2d 7; *Yeargain* v. *State,* 69 Okla.Crim. 98 [101 P.2d 273]; *Farmer* v. *Sellers,* 89 S.C. 492 [72 S.E. 224].)

■ The place searched was in San Francisco and the warrant was directed to "any police officer in . . . San Francisco." A copy of the return, unsigned, indicated that the return was intended for execution by a San Mateo County officer. However, a San Francisco police inspector testified that he received the warrant, asked two San Mateo officers to accompany him because they were more familiar with the case than he; he opened the door to the place searched; and he and the other officers were together throughout the search and until the objects seized were delivered to the San Francisco district attorney's office. This evidence warrants the trial court's determination that the search was legally conducted. (See *Rose* v. *United States,* 274 F. 245, 251.) The fact that the copy of the return in evidence names a San Mateo officer as "the officer by whom this warrant was executed" does not negate the fact that the San Francisco officer participated.

■ Daily complains that some objects seized at the apart-

ment were not specifically mentioned in the warrant which authorized a search for "certain surgical instruments and medication consisting *in part* of," followed by the specification of a number of such objects. (Emphasis added.) Such an enumeration we deem illustrative, not restrictive, of the designation "surgical instruments and medication." Accordingly, items not specifically enumerated but which answered this designation as thus illustrated were the subject of search pursuant to this warrant. It would appear that some of the objects seized and allowed in evidence are in this category. There was no error in that.

■ Moreover, when conducting such a search officers need not blind themselves to other things they see, such as objects used or usable in performing an abortion or objects indicative of the commission of other crimes. (*People* v. *Roberts,* 47 Cal. 2d 374, 379 [303 P.2d 721]; *People* v. *Acosta,* 142 Cal.App.2d 59, 64-65 [298 P.2d 29].)

■ Furthermore, any error in respect to such objects would not have been prejudicial. They were not numerous or especially impressive. They were merely cumulative in character. The really significant evidence consisted of various surgical instruments that were specified in the warrant.

We conclude that the corroborative evidence as to Daily is sufficient. His challenge of the legality of the search of his car and of his apartment marks the extent of his questioning of the sufficiency of corroboration as to him.

(2) *Was there sufficient corroboration as to defendant Poitevent?*

■ Mrs. Mullins, a friend of the prosecutrix, concerned over the latter's condition on the day after the operation for abortion, testified that she phoned Merle's Reducing Studio (operated by a partnership of which Mrs. Poitevent was a member), asked for "Kay" (a name by which Mrs. Poitevent was known) and "asked Kay what the supposed qualifications of the gentleman involved insofar as the abortion, his qualifications were, and Kay told [Mullins] . . . that he was a doctor, a member of the medical profession, a physician who had his practice in Los Angeles. . . ."

Defendant assigns error in the admission of this testimony, for lack of a proper foundation, because Mrs. Mullins said she could not recognize Mrs. Poitevent's voice. This point is not well taken. In *People* v. *Herman,* 49 Cal.App. 592 [193 P. 868], a telephone conversation was held admissible when the witness testified that she had a conversation with a man who

said he was "Herman" (defendant's last name) of the "American Junk Company" (the defendant's company). (See also *Union Const. Co.* v. *Western Union Tel. Co.*, 163 Cal. 298, 304-308 [125 P. 242].)

Defendant is mistaken also in her assertion that Mrs. Mullins' testimony was the sole bit of corroboration as to Poitevent, who by her own testimony corroborated the prosecutrix. Corroboration may consist of the testimony of the defendant and inferences therefrom. (*People* v. *Wilson*, 25 Cal. 2d 341, 347 [153 P.2d 720] ; *People* v. *Wayne*, 41 Cal.2d 814, 822 [264 P.2d 547].)

Mrs. Poitevent testified that she talked to Mrs. Bradley (mother of Mrs. Mullins) in the reducing salon, who told her of Mrs. Beale's pregnancy. Mrs. Poitevent told her she had a former boy friend who was a doctor "who might help." Mrs. Beale, the prosecutrix, called Mrs. Poitevent. They met and Mrs. Beale discussed her situation. Mrs. Poitevent met a friend in the city whose sister had had an abortion and who offered to try to get in touch with her sister's abortionist. Mrs. Poitevent told her friend to call Mrs. Mullins or Mrs. Bradley. Mrs. Poitevent then received a telephone call from someone named Don who was coming to talk to her about Mrs. Beale. Don came down to Mrs. Poitevent's shop, and explained that Mrs. Beale did not want to meet him at her home because of her family. Mrs. Poitevent talked to him in the parking lot and Don stated that "he knew someone who might be able to help her" and that he would get in touch with her. Mrs. Beale then came and told her that she had not been able to get all the money. Don then telephoned and said his friend would be free that evening. The same evening, a man came to the door and said he had an appointment with Mrs. Beale. Mrs. Beale came in and she and the man talked in a room of the salon. Mrs. Poitevent said she could not identify the man.

This testimony coincided with that of the prosecutrix at several significant points sufficiently to serve as corroboration, the principal difference being that Poitevent denied receiving the money from the prosecutrix and denied that Daily was the abortionist.

(3) *Did the court err in disallowing interrogation of the jurors as to their religious affiliations?*

One juror was asked whether she belonged to any religious groups, to which she answered "yes." The court stated that the juror need not tell what church she went to. This juror

was peremptorily challenged by the defense. It does not appear, nor did defendants suggest, that any religious organization countenances abortions, other than therapeutic abortions which this one was not. Accordingly, the particular religious group to which the juror belonged was of no particular significance. Moreover, the defendants did not use all of the peremptory challenges which the law allows.

Questions as to whether a prospective juror belonged to any sect whose teachings might interfere with the consideration of the case and whether the juror had any inherent belief based upon any church's teaching that might interfere with a fair consideration of the case were allowed.

We conclude that the defendants were not improperly curtailed in their interrogation of prospective jurors.

(4) *Did the district attorney commit prejudicial misconduct? No.*

 The prosecution showed an officer witness two catheters and started to ask a question concerning them. The court ruled it out and instructed the jury to disregard the exhibit. The prosecutor did not argue the matter and went on to other topics. The court's reason appears to have been that "catheters" were not specifically mentioned in the search warrant. It happens that both the warrant and the affidavit upon which it was based mentioned "catheter." So, there was no error and certainly no misconduct in seeking to identify the catheters as objects seized under authority of the warrant.

 The other incident related to some medical books that were found in Daily's apartment. The court did not permit the prosecution to go into this subject, no books having been specifically mentioned in the search warrant. The prosecutor immediately responded with this statement: "May the record show that the books have not been shown. I misunderstood Your Honor [referring to a conference between court and counsel on the admissibility of various objects seized.] I have not shown them, the backs nor the fronts, to the jury." The books may not have been subject to seizure and for that reason not admissible in evidence but we see no lack of good faith upon the part of the prosecutor, nor any prejudice to the defendants. It does not appear to us that it would be improper to elicit by oral testimony the fact that the officers observed that Daily had a collection of medical books, particularly if any of them contained information important or significant to an abortionist, testimony that was later allowed,

upon rebuttal. The extent of Daily's medical knowledge, self-taught or not, was relevant to the inquiry.

■ (5) *Did certain remarks of the court constitute prejudicial misconduct? No.*

Defendants direct attention to various observations made by the judge during the course of the trial, asserting that thereby the court unintentionally cast reflections upon the defense and its conduct and that no cautionary instruction, even if requested and given, could have erased the harm done.

We are not so impressed. Read in their context, we do not believe those remarks had the connotations now ascribed them. Some of them, indeed, had reference to the prosecution's case. Most of them, it would seem, reflect a desire of the court to keep the trial moving and to avoid unnecessary delay.

Such incidents, few in number, gleaned from 970 pages of transcript, coupled with a number of similar admonitions to counsel for the prosecution, do not indicate that defendants' right to a fair trial was at all impaired. Apparently they thought at the time there was no such impairment, for they interposed no objections and assigned no misconduct.

The judgment and the orders denying a new trial are affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied March 20, 1958.