Commonwealth *v.* Hrynkow, Appellant.

530

Argued April 30, 1974. Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy, Nix and Manderino, JJ.

reargument refused February 4, 1975.

*Stephen R. Bolden,* with him *Fell, Spalding, Goff & Rubin,* for appellant.

*Deborah E. Glass,* Assistant District Attorney, with her *David Richman,* Assistant District Attorney, *Abraham J. Gafni,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellee.

Opinion by Mr. Justice O'Brien, October 16, 1974:

On December 11, 1960, James Kilroy and William Mitchell, employees of the Holmes Protection Agency, entered a building located at 622 Arch Street, Philadelphia, after being warned by a silent burglar alarm. Upon entering the premises Kilroy saw a man and heard a shot. He then dove for cover. A second shot was fired, hitting Kilroy in the leg, and he was thereafter shot in the temple. Kilroy then saw Mitchell shot to death. Appellant, Peter Hrynkow was subsequently arrested and charged with the murder of William Mitchell, assault with intent to kill for the shooting of James Kilroy, larceny, burglary and violation of the Uniform Firearms Act.

In 1961, appellant was declared incompetent to stand trial. He was confined at Farview State Hospital until July of 1972, when, after being found competent to stand trial, he was convicted, by a jury, of murder in the second degree, assault with intent to kill and burglary. Post-trial motions were denied, and appellant was sentenced to a term of ten to twenty years and was recommitted to Farview State Hospital for a period not to exceed twenty years. This appeal followed.

Appellant first argues that the evidence produced by the Commonwealth was insufficient to prove appellant's guilt beyond a reasonable doubt. The Commonwealth's case was based upon the identification testimony of James Kilroy and certain circumstantial evidence linking appellant to the crime. When Kilroy was

initially questioned by police regarding the identity of the assailant, Kilroy identified him as Negro, of short height and unshaven. Appellant, a tall Caucasian, who had been arrested and taken to the scene of the crime after being found, out of breath and crouching in a nearby doorway soon after the murder was committed, was promptly released, presumably because he didn't match the description given by Kilroy.

On December 19, 1960, some eight days after the incident, Kilroy, still recovering in the hospital, was again questioned by police. This time, he gave a description of his assailant as a big white man with bushy hair. Since that description fit appellant, he was re-arrested on December 20, 1960, and was taken to Kilroy's bedside, along with three other individuals who were similar in appearance. Kilroy positively identified appellant as his assailant.[1] On January 31, 1973, at appellant's trial, Kilroy specifically identified appellant as the man who had shot him and Mitchell.

After appellant had been identified on December 20, 1960, he was taken back to police headquarters. While he was there, a search was conducted of his residence and clothing was taken to the police station. From this clothing, appellant picked out the clothing which he had worn the night of the crime. In addition, police seized the coat which appellant was wearing, since the police recognized it as the coat he had worn when he had first been arrested.

This coat and this clothing were scientifically analyzed and at trial, the Commonwealth produced the

---

[1] Kilroy later testified that he did not remember this bedside lineup because he was still suffering from head wounds received on the night of the crime. On January 30, 1961, Kilroy again picked out appellant at a police lineup. Appellant made constitutional challenges to the identification procedures involved, but has abandoned them in this appeal.

following pieces of circumstantial evidence which linked appellant to the crime:

(1) Hemp fibers and grease found embedded in the crotch of appellant's pants matched the fibers and grease found on a rope located in a dumbwaiter at the Arch Street building, which the Commonwealth contended served the burglar as a means of entry into the building. A Commonwealth witness testified that in order for hemp fibers to become so embedded in appellant's clothing, he would have had to be in "violent contact" with the rope, such as by sliding down it.

(2) Layered paint chips were found adhering to appellant's clothing which matched paint chips found at the scene of the crime.

(3) The rope found in the dumbwaiter contained every color of wool fiber contained in the clothing allegedly worn by appellant on the night of the murder. No fibers which did not correspond with the fibers found in appellant's clothing were found on the rope.

(4) The rope also contained dog hairs identical to dog hairs found on appellant's clothing.

In contending that this evidence was insufficient to prove his guilt, appellant emphasizes the original description given by Kilroy that his assailant was a "Negro male," and argues that the fibers found on his clothing, including the dog hairs, could have been picked up by him when he was returned to the scene of the crime shortly after his original arrest on the night of the crime. The Commonwealth explained that the apparent conflict in Kilroy's identification testimony was the result of Kilroy seeing a Negro police officer, Mayfield, who matched the description he gave initially, immediately after the incident, while he was still in a dazed condition.

The jury heard all of the evidence presented by the Commonwealth, including the changes in Kilroy's identification. The jury also heard appellant's alibi testi-

mony and his explanation for the circumstantial evidence which apparently linked him to the crime. While it is true that some of the evidence linking appellant to the crime was circumstantial, as we said in *Commonwealth v. Petrisko,* 442 Pa. 575, 580, 275 A.2d 46 (1971) : ". . . it is not necessary that each piece of evidence be linked to the defendant beyond a reasonable doubt. It is only necessary that each piece of evidence include the defendant in the group who could be linked while excluding others, and that the combination of evidence link the defendant to the crime beyond a reasonable doubt. . . ."

In our view, the combination of evidence, including the identification testimony of Kilroy, was sufficient to prove appellant's guilt beyond a reasonable doubt. See also *Commonwealth v. Pitts,* 450 Pa. 359, 301 A.2d 646 (1973).

Appellant argues that the trial court should not have permitted the Commonwealth's witness to testify regarding the tests performed on appellant's clothing because the clothing, itself, was not available at trial. (This evidence was apparently lost when the crime laboratory was moved.) According to appellant, the failure to produce these items meant that appellant was denied the right to be confronted with the evidence against him. This argument was rejected in *Commonwealth v. Cromartie,* 222 Pa. Superior Ct. 278, 294 A.2d 762 (1972), where the Superior Court held that a defendant could be found guilty of possession of marijuana even if the marijuana was not presented at trial, providing laboratory tests proving that the substance possessed was marijuana were offered into evidence. *Commonwealth v. Stafford,* 450 Pa. 252, 299 A.2d 590 (1973), cited by appellant, does not help appellant's case. In *Stafford,* we held that a defendant is entitled to inspection of any laboratory reports offered into

evidence. In the instant case, appellant was given such a right of inspection.

Appellant next argues that the court erred in refusing to suppress the clothing seized in the search of his residence. At the time of his arrest and this search, on December 20, 1960, appellant, although not formally married, had been living with Miss Catherine Smith for approximately eight years. When the police went to appellant's residence, it was Miss Smith who admitted them and gave them permission to take appellant's clothing. Appellant's attempt to suppress this evidence is two fold.

Appellant first argues that Catherine Smith's consent to the search was not voluntarily made. However, although Miss Smith was unable to remember at the suppression hearing in 1972 what she had been told in 1960, the police did testify that they informed her that her common-law husband, appellant, was a suspect in the shooting which occurred at Arch Street, and that they wanted her permission to take his clothing, but that she had a right to refuse that permission, if she wished. This testimony supports a finding that Miss Smith's consent was voluntarily given. See *Coolidge v. New Hampshire,* 403 U.S. 443 (1971).

Secondly, appellant argues that even if Miss Smith voluntarily gave her consent, it could not bind appellant, since it was motivated by Miss Smith's hostility towards him. In making this argument, appellant emphasizes Miss Smith's testimony that she was afraid of appellant and that she only visited him once during the years after he was committed to Farview, in 1961. Appellant cites *United States ex rel. Cafey v. Mazurkiewicz,* 431 F.2d 839 (1970), where the United States Court of Appeals for the Third Circuit stated: "A new and intruding element which has not been isolated heretofore may be said to distinguish a third class of cases. This element is the consenting party's agree-

ment to the search out of motives of hostility to the other, made with the intent to harm him by an antagonistic consent. Where it is possible to identify this element a serious question would arise whether the right to consent is not spent when it reaches this point of deliberate antagonistic intrusion on the rights of the other who has an equal right to possession or control. . . . This would be especially true where a wife intentionally acts against her husband's interest, since she would not be acting in harmony with the marital relationship from which her joint right of ownership or control is derived, but in antagonism to it." At page 843.

Whether or not this statement, which was dictum, represents the law of this Commonwealth need not here be decided, for we do not find it applicable to the facts of the instant case. At the suppression hearing, Miss Smith, who had by then become Mrs. Williams, having married a week before the hearing, expressed no hostility towards appellant. Instead, although it was clear that she no longer loved appellant, who, it must be remembered, had been confined to Farview for over eleven years, the witness still expressed sympathy and understanding for his problems during the eight years they had lived together. In her words, their fights were only because appellant occasionally "got frustrated." As Miss Smith asked rhetorically, "Did you ever see anything run smooth?" Overall, the witness's testimony amply supported the suppression court's conclusion that: "It appears that like most marriages there were difficult times but in general [Miss Smith] did care for her husband. . . . She did act out of a desire to help her husband."

Appellant next argues that the seizure of his clothing at police headquarters was unconstitutional. On December 20, 1960, when James Kilroy was presented with suspects who fit the description of the person

he saw shoot William Mitchell, and picked out appellant, appellant was returned to police headquarters, where he was asked to pick out the clothing he was wearing on the evening of the murder. These clothes were the ones seized at his apartment. In addition, appellant turned over the coat he had on at the lineup. Appellant was then released from custody. As discussed above, these garments were tested by the police laboratory and were found to contain microscopic particles that matched substances found at the scene of the homicide.

Appellant argues that the seizure of his coat was improper, since it was conducted without a search warrant. We do not agree. In *United States v. Edwards*, 415 U.S. 800, 14 CrL 3147 (1974), the Supreme Court of the United States was faced with a situation where a defendant's clothes were seized without a warrant the day after his arrest. In upholding this search, the Supreme Court stated:

". . . it is difficult to perceive what is unreasonable about the police examining and holding as eivdence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.

". . . In upholding this search and seizure, we do not conclude that the warrant clause of the Fourth Amendment is never applicable to post arrest seizures of the effects of an arrestee. But we do think that the court of appeals for the First Circuit captured the essence of situations like these when it said in United States v. DeLeo, 442 F.2d 439:

" 'While the legal arrest of a person should not destroy his privacy of his premises, it does—for at least a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape and evidence.' " At pages 806-808.

Under the rationale of *Edwards, supra,* the police were entitled to seize appellant's coat because they

reasonably believed that it was the one which appellant wore on the night of the crime, and thus might contain evidence vital to the prosecution—evidence which might be destroyed if the coat were returned to appellant.

Appellant next argues that before he was asked to pick out the clothing which he wore on the night of the crime, he should have been given his *Miranda* rights. The suppression court agreed with appellant and suppressed all testimony to the effect that appellant had indicated which clothing he wore. The police, who were in lawful possession of the clothing, as we have previously stated, therefore had a right to conduct the tests. Since the jury was not told that appellant had admitted wearing the clothing tested, he was not prejudiced by the failure to warn him before he made that admission.

Appellant lastly argues that the trial court erred in refusing his counsel's request that the rope found in the dumbwaiter, which contained a notation of the evidence tag attached to it indicating that the suspect was an "unknown Negro" be sent out with the jury. Appellant argues that if the exhibit had been sent out with the tag, it might have raised a reasonable doubt in the minds of the jurors as to appellant's guilt. Rule 1114 of the Pennsylvania Rules of Criminal Procedure vests in the trial court discretion as to what evidence should be sent out with the jury. Since our examination of the record discloses that the wording on the evidence tag was emphasized by appellant's counsel in his cross-examination of the Commonwealth witness when the rope was offered into evidence,[2] and again in his

---

[2] When the rope was offered, the Commonwealth's witness read the tag as stating that the suspect was an "unknown man." Not until cross-examination did the Commonwealth witness finally admit to the actual wording of the tag.

closing arguments, we find no abuse of discretion which would entitle appellant to a new trial.

Judgment of sentence affirmed.

Mr. Justice ROBERTS, Mr. Justice NIX and Mr. Justice MANDERINO concur in the result.