476 A.2d 389

**COMMONWEALTH of Pennsylvania**

v.

**Gerald Joseph MASON, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 14, 1983.

Filed April 13, 1984.

Petition for Allowance of Appeal Granted Aug. 29, 1984.

William R. Bernhart, Reading, for appellant.

J. William Ditter, III, Assistant District Attorney, Norristown, for Commonwealth, appellee.

Before CAVANAUGH, MONTEMURO and HESTER, JJ.

MONTEMURO, Judge:

Gerald Joseph Mason was convicted by a jury in the Court of Common Pleas of Montgomery County of burglary [1] and criminal mischief. [2] Following the denial of timely post-trial motions, he was sentenced to imprisonment for a term of not less than six (6) years, nor more than twenty (20) years on the burglary conviction. For his conviction of the crime of criminal mischief, he received a sentence of three (3) years probation. He was also ordered to pay the costs of prosecution and to make restitution. This appeal followed.

1. 18 Pa.C.S.A. § 3502(a).

2. 18 Pa.C.S.A. § 3304.

The intricate and detailed web of circumstantial evidence spun by the prosecution took three (3) days and over three hundred (300) pages of testimony to complete. The effectiveness of this web, ascribable in no small part to the inexorable and exceedingly professional police investigation, is evidenced by the ensnarement of appellant upon the finding of guilt by the jury. A meaningful understanding of the issues briefed and argued by appellant in this appeal, as well as our discussion of those issues, necessitates a summarization of the events which ultimately led to the appellant's arrest.

## THE FACTS

At some time during the early morning hours of April 4th, 1978, a McDonald's restaurant, located on Route 73 in Douglas Township, Montgomery County, was burglarized. Detective John Crowley, a county detective in the employ of the District Attorney of Montgomery County, arrived at the crime scene at 7:45 A.M. that same morning. His investigation revealed that the restaurant's safe had been "burnt" or "torched" open. An opening of approximately seven (7) inches in width by ten (10) inches in height had been cut around and completely through the dial of the safe. The detective was able to observe that the safe was charred and that black soot stains appeared on most of the interior walls. The intruders who performed the laser-like surgery on the safe left their victim in complete disarray. Strewn about were numerous papers and a number of rolls of pennies in open-ended wrappers. The coin wrappers were stained with soot and intermittently burnt. The very end coins in the rolls of pennies were stained, charred and blackened. Several plastic cash register drawers, parts of which had melted from the heat of the intruder's torch, as well as slag balls, were also observed by Crowley's investigative eyes. The area outside the safe was also, as we shall see, a source of evidence left behind by not-so-clever thieves. A large green pail with water was positioned in front of the safe; they were, after all, burglars—not arson-

ists. With an uncharacteristic display of concern for tidiness, the miscreants had opened a cardboard box and laid it flat on the floor outside the safe. The cardboard's surface was observed by Crowley to have numerous shoe or boot prints which in turn contained many small circles running from left to right. All of the evidence, both inside and outside the safe, was confiscated by the detective. Before leaving the scene of the burglary, Detective Crowley broadcast a radio message concerning the burglary, as well as a bank alert notifying numerous banks in the area to be on the lookout for burnt or scorched money, bills or coins.

Prior to Detective Crowley being apprised of the burglary, other events had already taken place; events which would later become part of the web of evidence. At approximately 3:45 A.M. on the morning of April 4th, four hours before Crowley arrived on the scene, a Douglas Township police officer and a truck driver for a dairy farm, observed an automobile pulling onto the highway from a driveway adjacent to the burglarized McDonald's. The police officer was in his police vehicle and the truck driver was in his truck when they independently made the same observation at about the same time. They both agreed it was a "late model, Lincoln Continental, in the late seventies." The police officer thought the vehicle was dark brown and the truck driver thought it was black. The milktruck driver remembers that it had a vinyl top; he only saw a driver. The police officer saw a driver and a passenger. As we shall see, at the time of his arrest, appellant owned a 1975 black Lincoln Continental with a vinyl top.

The web continues to spread. On April 5th, 1978, an unidentified blonde woman who styled her hair with a single "pigtail" running from the top of her head down the middle of her back—a coiffure relevant only for its later evidentiary value—entered the American Bank in Temple, Pennsylvania, a suburb of the city of Reading in Berks County. The young woman, whose photograph was later discovered and taken by the police from the appellant's apartment, exchanged one hundred one dollar bills and one hundred

dollars in wrapped quarters and dimes for two one hundred dollar bills. The bank teller, mindful of the bank alert sent out by Detective Crowley the previous day, discerned scorches and burnt edges on several of the one dollar bills and her olfactory sense enabled her to perceive that the money had an unusual odor. The wrappers containing the coins were stamped with appellant's name and address, i.e., Gerald Mason, 440 Oley Street, Reading, Pa. Detective Crowley was notified of the currency exchange and on the same day, April 5th, he went to the American Bank, interviewed the bank teller, received a description of the young lady who requested the exchange, and confiscated the money as evidence.

On April 6th, 1978, two days after the McDonald's burglary in Montgomery County, police officer Robert Kopinski of Coal Township in neighboring Northumberland County, was conducting a routine investigation of an open door of a motorcycle shop located on Route 61. No cause for alarm—Officer Kopinski learned that an errant worker had inadvertently left the door open. While inside the motorcycle shop, Officer Kopinski observed a late model car on Route 61 acting in a suspicious manner. Specifically, he observed the vehicle traveling at a slow rate of speed toward the motorcycle shop, then he saw it enter the parking lot of the motorcycle shop, drive out of the parking lot and proceed back up Route 61 from whence it came. Still under the watchful eye of the police officer, the vehicle then turned into the parking lot of a McDonald's restaurant and in a short while it drove out of the restaurant parking lot, crossed all four lanes of Route 61 and pulled into the parking lot of a closed gas station. The driver of the vehicle got out of the car and ran across the highway toward the closed McDonald's restaurant.

Officer Kopinski left the motorcycle shop and went to the McDonald's restaurant. His investigation of the restaurant revealed that the doors had been partially jimmied open. He immediately requested assistance from all other local police departments in the area. A search of the restau-

rant's parking lot turned up a bag—Officer Kopinski called it a gym bag—which contained a crow bar, screw drivers and other tools. In the vicinity of the restaurant's garbage container, the police found a duffel bag containing acetylene torches, a sledge hammer and, in close proximity to the duffel bag, a set of oxygen tanks for the torches; clearly not the kind of equipment used in preparation of the world-famous "big Mac." A further search of the area failed to turn up the burglars whose unlawful intrusion had been interrupted. Officer Kopinski then sent or had sent a teletype message requesting information on the vehicle still positioned on the gas station lot, dutifully waiting to carry away its owner and McDonald's restaurant's money. He soon learned that the vehicle, or one similar to it, was wanted for investigation of a burglary of a McDonald's restaurant in Coal Township, Montgomery County, and further that it was owned by the appellant.

Officer Kopinski's fellow officer, Charles Shuey, left him at the restaurant with the restaurant manager who had been summoned to the scene, and crossed the highway to investigate the automobile. He observed that it was a two-door, 1975 black Lincoln Continental with a vinyl top. No one was in the car. The officer noticed that the trunk lid was slightly ajar and aware of the message received by Kopinski concerning the use of a similar car in the Montgomery County burglary, the officer lifted the trunk lid to see if anyone was hiding therein. He observed a small shotgun and what appeared to be a canvass bank bag. Without touching anything, he closed the trunk. The car was ordered to be towed to the Coal Township police station in Northumberland County. As we shall see, the appellant says this investigation of the car, while on the lot of the closed gas station in the early hours of the morning, across the street from the McDonald's restaurant, where a burglary had been aborted, was illegal.

We move now to the next phase of this early morning drama unfolding on the nearly deserted highways and byways of a rural community whose inhabitants were enjoy-

ing a nocturnal slumber never knowing that the peace and dignity of their community had been violated.

Trooper Richard L. Ziminsky, of the Pennsylvania State Police, assigned to the Shamokin Barracks in Northumberland County, went on duty at 6:00 A.M. on the morning of April 6, 1978. He was told to patrol the area south of Shamokin for two possible burglary suspects of the McDonald's restaurant on Route 61. The trooper began patrolling on Route 61 and entered the driveway of the Northumberland County Democratic headquarters building. The building was situated about 300 yards off the highway in a wooded, secluded area and was located approximately a mile and one-half from the aborted burglary. Appellant will tell us later that the trooper should never have conducted a search of the Democratic headquarters and the area surrounding the building—forget the fact that he was patrolling the area in search of burglary suspects. We, on the other hand, view the trooper's investigation of the area as a prudent and professional course of police action—but for now, let us rejoin Trooper Ziminsky. As he drove his vehicle toward the closed Democratic headquarters, he saw a man flee from behind the building. He immediately relayed his observation to his desk officer in the barracks, who in turn notified Officer Kopinski, who was still at the scene of the attempted burglary, that the state trooper was at the Democratic headquarters and in the process of apprehending a suspect. The trooper alighted from his vehicle and called three times for the running suspect to stop. After his third command to stop, the trooper observed the suspect attempting to climb a shale bank. Again, he ordered the suspect to stop. Realizing that his voice commands were not producing the desired result, the trooper fired a warning shot with his service revolver. The crackling effect of his explosion which propelled the missile into the approaching dawn caused the fleeing suspect to stop, change direction, and after some mini-gyrations to his right, he finally approached the trooper with his hands in the air. The trooper ordered the suspect to prostrate himself on the

ground as the trooper covered him with his revolver. Kopinski, who arrived at the Democratic headquarters at this juncture, secured the man's hands with handcuffs and took him into custody. Appellant says this police action constituted an arrest. We agree. With characteristic gall, he says it was an arrest without probable cause.

A further search of the area in the immediate vicinity of the Democratic headquarters was conducted and appellant's accomplice, Rico Kelino, was found hiding behind a pillar.[3] He was pointing a gun at the officers but responded affirmatively to the state trooper's command to drop the gun and surrender with his hands in the air. He, too, was taken into custody by Officer Kopinski. Both appellant and his accomplice were given their *Miranda*[4] rights by Kopinski when they were taken into custody.

By way of pertinent aside, we should mention two other happenings which have at least tangential relevance to this case. First, Officer Kopinski said that at about 5:30 A.M. —a half hour before the state trooper began his tour of duty—he was in the Coal Township police station assembling all of the evidence he had gathered from the scene of the attempted break-in of the McDonald's restaurant. While there, he received a telephone call from a woman who lived between the restaurant and the Democratic headquarters. The woman told him she had seen two men attempting to break into a car. Secondly, both Officer Kopinski and Trooper Ziminsky said they observed that a window at the rear of the Democratic headquarters building had been broken and a telephone was seen hanging from the window.

Following a slight intermission, the final act in this drama begins. The police in Coal Township, Northumberland County, informed Detective Crowley of Montgomery County that they had arrested appellant and Kelino for the attempted burglary of the McDonald's restaurant in their

3. Appellant's accomplice, Rico Kelino, apparently was a fugitive from justice and his case was severed from appellant's.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

county. Detective Crowley arrived at the Coal Township police station at approximately 9:00 A.M. that same morning, April 6, where he saw, for the first time, appellant and Kelino. He identified himself, read them their *Miranda* rights and informed them he wanted to question them about the burglary of the McDonald's restaurant in Douglas Township, Montgomery County, on April 4, 1978. They gave Crowley their names and said they both lived at 440 Oley Street in Reading, Berks County. That was as much as they would say.

Appellant's vehicle had been towed to the Coal Township police station. While Crowley was at the police station, he observed a search of appellant's car made pursuant to a search warrant prepared and executed by the police of Coal Township. As a consequence of that search the following items were seized from appellant's vehicle: a sawed-off Remington .12 gauge pump-action shotgun, two tanks for cutting or welding, approximately six (6) pairs of work gloves, a ⅜" Black and Decker drill and the appellant's owner's card. The ever-alert Detective Crowley also observed that the jacket Kelino was wearing had numerous small burnholes down the front and on one arm of the jacket. He also saw various denominations of paper currency totalling nine hundred ten dollars ($910.00) and, of that, a twenty dollar ($20.00) bill and a five dollar ($5.00) bill were singed or scorched. This money had been taken from Kelino by the Coal Township police. Crowley then made an even more important and startling observation—a catastrophe for appellant; the sole of one of appellant's boots had a pattern which appeared to be identical to the pattern impression he had seen on the piece of cardboard in front of the burglarized safe at McDonald's restaurant in Montgomery County. He asked appellant to remove his boots but appellant refused. Crowley then told police officer Richard Higgins of Coal Township, who by this time had assumed charge of the attempted burglary in Northumberland County, of the similarity of pattern. Higgins told Crowley that they also had footprints in the area of the attempted burgla-

ry. Chief Weaver of the Coal Township police directed one of his officers to remove appellant's boots. Mission accomplished.

That same morning, April 6th, Detective Crowley prepared a search warrant for appellant's apartment, 440 Oley Street in Reading, Berks County, setting forth in the probable cause section of the warrant essentially all of the facts as we have attempted to describe them to this point. The warrant was issued by District Justice George Graeff in Reading, Berks County, and at 5:20 P.M. on April 6th, 1978, Crowley, Chief Hummel and Sergeant Stofflet, all law enforcement officers of Montgomery County, conducted a search of appellant's apartment. They were accompanied by Detective Loren Young and Officer Wright of the Reading Police Department. As a consequence of that search, the following items were removed from appellant's apartment: a rubber stamp that left an impression of appellant's name and address; a photograph of two young white women standing on either side of a mounted trophy fish, one of the women wearing her blonde hair styled in a pigtail; a grey metal cash box found under appellant's bed which contained numerous coin wrappers and coins; and a one-gallon metal bucket that contained twelve (12) rolls of wrapped pennies. Crowley observed that some of the coins had black stained surfaces. At the suppression hearing, Detective Crowley testified on direct examination that the Reading police officers did not participate in the search, although they were inside the apartment. Appellant will later argue that since Crowley, a Montgomery County Detective, had no authority to conduct a search of appellant's apartment in Berks County, the search was illegal and the items seized should have been suppressed.

On April 8th, 1978, four days after the burglary of the McDonald's restaurant in Douglas Township, Montgomery County, Detective Crowley went to the Northumberland County Prison and executed properly issued warrants of arrest upon appellant and Rico Kelino. They were both informed of their *Miranda* rights and told they were being

arrested for the burglary of the McDonald's restaurant in Montgomery County, which occurred on April 4th, 1978.

At trial, in addition to all that we have related so far, the jury would also hear the testimony of the bank teller and three agents from the Federal Bureau of Investigation. The bank teller testified that the young blonde woman in the photograph taken from appellant's apartment was the same young lady who had exchanged the currency in the American Bank on April 5th, 1978. The F.B.I. agents would offer testimony concerning the rubber stamp and coins found in appellant's apartment as well as testimony concerning appellant's boots and the impressions left on the cardboard.

With all of this evidence, albeit circumstantial, the jury understandably found appellant guilty of the crimes charged.

## DISCUSSION

Appellant alleges certain claims of error, some made at the suppression hearing and others made at trial, which are completely devoid of merit, unsupported by the record, adequately disposed of in the opinion of the lower court,[5] and deserving of no further discussion. They are:

1. That the trial judge erred in refusing to grant a motion for a mistrial and in allowing evidence showing unrelated crimes in other counties;

2. That the trial judge erred in his instructions to the jury concerning reasonable doubt and presumption of innocence;

3. That the trial judge erred in his charge in the manner of reviewing the evidence and in regard to the instructions concerning circumstantial evidence;

5. Because of the retirement of the trial judge, the Honorable Robert Honeyman, the opinion per Pa.R.A.P. 1925, was authored by the Honorable Richard S. Lowe, President Judge of the Court of Common Pleas of Montgomery County.

4. That the search of the appellant's vehicle both with and without a search warrant was illegal and without probable cause;[6] and

5. That the trial judge erred by instructing the jury that because the appellant did not testify, no adverse inference could be taken therefrom. *See, Commonwealth v. Butch,* 257 Pa.Super. 242, 390 A.2d 803 (1978); 42 Pa.C.S.A. § 5941.

We shall now address appellant's remaining contentions.

■■■ Appellant initially claims that the suppression hearing judge, the Honorable Mason Avrigan, committed error in failing to make findings of fact and conclusions of law.[7]

6. On this issue, *see Commonwealth v. Bosworth,* 310 Pa.Super. 378, 456 A.2d 661 (1983), an opinion of this court authored by the Honorable Donald A. Wieand. The court held that the defendant Bosworth, who parked his vehicle on property of another in violation of posted "no trespassing" signs, did not have a reasonable expectation of privacy with respect to stolen property stored in the trunk of his vehicle from which he had allowed keys to remain dangling while he committed a burglary. We would apply the same reasoning here where appellant left his vehicle on the private property of another, namely, the gas station, in the early morning hours when the gas station was closed and then left his vehicle unattended with the trunk partially open only to disappear after running across the four lane highway.

7. This claim is based on Pa.R.Crim.P. 323(i) which reads: "At the conclusion of the hearing, the Judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights, or in violation of the rules or any statute, and shall make an order granting or denying the relief requested."

Even if we were to find that there was no waiver of this claim, we still would not, on this claim alone, vacate the judgment of sentence and remand for a new suppression hearing. At the conclusion of the suppression hearing wherein the Commonwealth presented five (5) witnesses, beginning on p. 100 of the notes of testimony and ending on p. 121, the court and counsel for the appellant engaged in a colloquy wherein the court heard counsel's arguments with reference to the legality of appellant's arrest, the seizure of appellant's boots, the search of appellant's automobile, the search of appellant's apartment, the legality of the search warrant for appellant's apartment and the legality of the inventory and receipt of the items seized from the apartment. As to each and every argument the court made a ruling and stated its reasons. Although not set forth in separate findings of fact and conclusions of law, we find under the facts of this case

We have reviewed appellant's motion for new trial and/or arrest of judgment and find no objection predicated on this claim. Under those circumstances, the claim has been waived and will not be considered. *See Commonwealth v. Blair,* 460 Pa. 31, 331 A.2d 213 (1975); Pa.R.A.P. 302(a); Pa.R.Crim.P. 1123(a).

Appellant's next claim of error which merits discussion is that the seizure of his boots while he was in custody in Northumberland County was illegal for two reasons: (1) there was no probable cause for the arrest of the appellant to render the seizure of his boots incident to a lawful arrest; (2) the seizure of the boots without a warrant for use as evidence of another crime in Montgomery County was an illegal search in violation of the appellant's 4th Amendment rights. (Appellant's brief at 13). Therefore, according to appellant, the suppression court committed reversable error in refusing to grant his suppression motion concerning the boots. We do not agree.

In *Commonwealth v. O'Bryant,* 479 Pa. 534, 437, 388 A.2d 1059, 1061 (1978), the supreme court set forth the scope of appellate review in suppression motion denials:

On appeal from denial of a suppression motion, the court must consider only the evidence presented by the Commonwealth and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. (Citations omitted). Where the suppression court's findings have ample support in the record, they may not be disturbed on appeal.

■ The first prong of appellant's argument concerning the seizure of his boots, i.e., lack of probable cause to arrest, is ludicrous. In *Commonwealth v. Allen,* 287 Pa. Super. 88, 429 A.2d 1113 (1981), we set forth the standards applicable to an arrest based on probable cause:

sufficient compliance with 323(i). Finally, we would hold, in any event, that non-compliance with 323(i) in this case was harmless error beyond a reasonable doubt. *Cf. Commonwealth v. Williams,* 323 Pa.Super. 512, 470 A.2d 1376 (1984).

A legal arrest without a warrant depends upon probable cause. *Commonwealth v. Pinney,* 474 Pa. 210, 378 A.2d 293 (1977); *Commonwealth v. Bishop,* 425 Pa. 175, 228 A.2d 661 (1967), *cert. denied,* 389 U.S. 875, 88 S.Ct. 168, 19 L.Ed.2d 159 (1967). Probable cause exists if the facts and circumstances which are within the knowledge of the police at the time of arrest, and of which they have reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that a suspect has committed or is committing a crime. *Commonwealth v. Powers,* 484 Pa. 198, 398 A.2d 1013 (1979); *Commonwealth v. Culmer,* 463 Pa. 189, 195, 344 A.2d 487, 490 (1975); *Commonwealth v. Jones,* 457 Pa. 423, 428, 322 A.2d 119, 123 (1974); *Commonwealth v. Garvin,* 448 Pa. 258, 262, 293 A.2d 33, 35–36 (1972); *Commonwealth v. Bishop, supra.* The burden of showing probable cause is on the Commonwealth. *Commonwealth v. Holton,* 432 Pa. 11, 14–15, 247 A.2d 228, 230 (1968). The standard of probable cause, however, must be applied to the totality of the circumstances facing the police. Facts insufficient to justify an arrest if considered separately may in combination supply probable cause. *Commonwealth v. Roscioli,* 240 Pa.Super. 135, 138, 361 A.2d 834, 836 (1976). In *Commonwealth v. Tolbert,* 235 Pa.Super. 227, at p. 230, 341 A.2d 198, at p. 200 (1975), this court said 'When we examine a particular situation to determine if probable cause exists, we consider all factors and their total effect, and do not concentrate on each individual element .... We also focus on the circumstances as seen through the eyes of the trained officer, and do not view the situation as an average citizen might.... Finally, we must remember that in dealing with questions of probable cause, we are *not* dealing with certainties. We are dealing with the factual and practical considerations of everyday life on which reasonable and prudent men act. This is not the same 'beyond-a-reasonable-doubt' standard which we apply in determining guilt or innocence at trial. *Commonwealth v. Devlin,* 221 Pa.Super. 175, 289 A.2d 237 (1972).

*Id.,* 287 Pa.Super. at 102, 429 A.2d at 1119–1120 (quoting *Commonwealth v. Kazior,* 269 Pa.Super. 518, 523–25, 410 A.2d 822, 824–25 (1979), *allocatur denied* (1980)).

When we apply these principles to the facts of this case as we have set them forth in the first part of this opinion, it is clear that Trooper Ziminsky and/or Officer Kopinski had more than probable cause to arrest appellant and his accomplice, Kelino.

▉ The second prong of appellant's argument is that even if there was probable cause to arrest, it was improper for Detective Crowley of Montgomery County to seize his boots while he was in custody in Northumberland County and then use the boots as evidence in the trial of the case *sub judice* in Montgomery County. In support of this argument, the appellant relies upon *Commonwealth v. Little,* 9 D. & C.3d 590 (1977), *affirmed per curiam* by this court at 268 Pa.Super. 590, 394 A.2d 611 (1978).[8]

A cursory reading of *Little, id.,* might lead one to conclude it is remarkably similar to the case before us; however, on close analysis, we are convinced it is inapposite. In *Little,* Trooper George Murch, a criminal investigator for the Pennsylvania State Police, went to the West Goshen Township police station to investigate any connection Little may have had with a burglary that had occurred the day before. At the time, Little was incarcerated on a totally different charge. Trooper March advised him of his constitutional rights against self-incrimination, which he indicated he understood. The trooper then directed him to take off his boots, explaining that he wanted to take a boot print to see if Little's boot print matched one found at the scene of the burglary the trooper was investigating. At the time the trooper was collecting the boot print, the only evidence available to the State Police concerning Little's involvement in the burglary was that his car had been seen several times in the immediate vicinity where the burglary occurred. When this investigation was being conducted by Trooper

8. We note that *Little, supra,* was decided by this court in a bench *per curiam* without opinion.

Murch, Little had not been placed under arrest for the burglary charge—he was in police custody as a result of having been arrested on another charge.

The trial judge, the Honorable Dominic T. Marrone, President Judge of the Court of Common Pleas of Chester County, observed that "in fact, the record of testimony from the suppression hearing suggests that Trooper March was taking the boot print from defendant in an effort to establish probable cause for defendant's arrest on the burglary charge." *Id.*, 268 Pa.Superior Ct. at 591, 394 A.2d 611. Judge Marrone, in a well-reasoned opinion, held that the obtaining of the boot was a search, that *the search was not incident to a lawful arrest* and was not conducted pursuant to a warrant. Consequently, the warrantless search was unreasonable and the evidence was suppressed. As stated, this court then affirmed.[9]

However, in the case before us, we have already found that appellant's boots were seized while he was in lawful custody of the police following his valid arrest with probable cause for the attempted burglary of the McDonald's restaurant in Northumberland County. More importantly, and contrary to what appellant says, his boots were taken not by Detective Crowley of Montgomery County, but rather by police officers of Northumberland County to be used in connection with the investigation of the attempted burglary in Northumberland County, for which appellant had been legally arrested with probable cause. Police officer Richard Higgins of the Coal Township police, Northumberland County, testified at the suppression hearing as follows:

Q. Were you with Detective Crowley of Montgomery County Detectives on that morning?

9. Judge Marrone properly pointed out that "unlike *Commonwealth v. Daniels*, 474 Pa. 173, 377 A.2d 1376 (1977), and *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974), where, after a lawful arrest, articles of clothing were taken from the person of an individual for later use at trial to prove the identity of the accused, the seizure of the boot in the instant matter was not incident to a lawful arrest. The police were attempting to justify an arrest based on what they hoped to be able to conclude upon taking the evidence of the boot print." *Id.*, 268 Pa.Superior Ct. at 592, 394 A.2d 611.

538

A.  Yes, sir. .

Q.  What time did you see him?

A.  I would say approximately 10:00 A.M.

Q.  Now, would you tell us what Mr. Mason was wearing on his feet at that time.

A.  He had a pair of, what I would call working or hiking boots, heavy boots.

Q.  *What happened to those hiking boots or working boots?*

A.  *They were seized by our Department.*

Q.  What did you do with the boots?

A.  *The boots were removed from Mr. Mason by one of our officers* and then turned over to me and I tagged them and they were placed in the Evidence Room, along with other items.

Q.  Would you tell us how the boots were taken from Mr. Mason?

A.  One of our officers unlaced them and removed them.

Q.  Prior to that, would you tell us what occurred as far as Detective Crowley, your Chief Weaver and yourself were concerned?

A.  Detective Crowley arrived at the station and I was introduced to him. I had a brief conversation with him and then I had a phone conversation with another gentleman which occupied some of my time. When I came out in the hallway Detective Crowley and the Chief were there in the hallway and the Chief said to me that Detective Crowley had interest in these boots that Mr. Mason had on. *I told the Chief that, I felt as if it was possible, being that the sole mark was such an odd variety, that we could possibly find some footprints of our own and make our case that much better, and I felt as if we, as the arresting officers, should seize the shoes and hold them.*

Q.  What happened after that discussion?

A.  Then we went back into the room where Mr. Mason was at that time, and the boots were removed.

Q. Do you remember the officer's name who removed the boots?

A. Officer Waugh.

Q. *As part of your investigation, did you go back to McDonald's and look for footprints?*

A. *I did not, sir.*

Q. *Did some other person?*

A. *Yes, sir.*

Q. *Who was that?*

A. *Officer Kopinski.*

Q. *Do you know if he found any footprints?*

A. *Yes, sir, there were footprints found. In fact, we took photographs of them.*

Q. Who took the photographs?

A. David Howard (phonetic), he is our photographer.

(N.T. Suppression Hearing, pp. 90, 91, 92) (Emphasis supplied)

As the testimony of Officer Higgins indicates, not only were appellant's boots seized as possible evidence in connection with the attempted burglary for which appellant was arrested, but further, that the Coal Township police in furtherance of their investigation, had in fact found footprints at the crime scene and made photographs of these prints.[10]

The law is clear that where a defendant is in lawful custody of police as a result of a lawful arrest, as the appellant was, the police are entitled to seize articles of clothing from the defendant which might possibly be used as evidence. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *Commonwealth v. Daniels*, 474 Pa. 173, 377 A.2d 1376 (1977); *Commonwealth v. Hrynkow*, 457 Pa. 529, 330 A.2d 858 (1974).

---

**10.** In rejecting appellant's claim of error on the use of his boots as evidence, we have no way of knowing what the analysis of the boot prints was in Northumberland County or if they were ever used as evidence in that case—nor do we believe any of that information is relevant to our disposition of this issue.

Although our research on this issue has failed to disclose a case directly on point, and none has been cited to us by either counsel or the lower court, we hold that the suppression court committed no error in refusing to suppress the use of appellant's boots where, as here, they were lawfully seized by the police in Northumberland County as evidence of a crime committed in that county and subsequently turned over to Detective Crowley for use as evidence in another unrelated crime in a sister jurisdiction—in this case, Montgomery County. We should also say at this point that Detective Crowley testified that he first saw appellant's boots in the Coal Township police station in Northumberland County on April 6th, 1978, and did not see them again until September 13th, 1978. (N.T. Trial pp. 118, 119).

Appellant's final arguments implicate the search of his apartment located at 440 Oley Street, in the city of Reading, Berks County, by Detective John Crowley, who as we have indicated was a county detective in the employ of the District Attorney of Montgomery County.

Preliminarily, we dismiss as being completely without merit appellant's argument that the search warrant was obtained without sufficient probable cause on the face of the affidavit. We note further that appellant makes this bald assertion without comment.

Appellant claims that because Detective Crowley had no authority to act in Berks County, he could neither act as the affiant on the search warrant obtained in Berks County, nor could he execute that warrant by conducting the search of appellant's apartment.

The Commonwealth-appellee first argues that Detective Crowley did have authority to *obtain* the search warrant and second, because there was authority to *obtain* the warrant, appellant should be precluded from attempting to distinguish the *execution* of the warrant in the presence of Reading police officers from the *obtaining* of the warrant. By way of further argument, Commonwealth-appellee states that Pa.R.Crim.P. 2004 which reads "a search war-

rant shall be served by a law enforcement officer [11]" is vague as to who may serve the warrant and even assuming the warrant must be served by officers of that jurisdiction, i.e., officers with authority to act in the city of Reading, the fact that the Reading police officers were present at the scene and had supervisory authority over the search and could protect their citizens from a search beyond the scope of the warrant, was enough to make the *execution* of the warrant legal.

We agree with Commonwealth-appellee that the first prong of appellant's argument which claims that the warrant was improperly issued to Detective Crowley because he had no authority to *obtain* a search warrant in Berks County is devoid of merit.

In *Commonwealth v. Kunkel,* 268 Pa.Super. 299, 408 A.2d 475 (1979) this court, in an opinion authored by Spaeth, J.[12] decided that:

> No statute or rule of criminal procedure requires that a search warrant be issued only to a person empowered to execute it. Indeed, the Rules of Criminal Procedure indicate that the contrary is true. Under Pa.R.Crim.P. 2006, any individual may be the affiant for a search warrant.

*Id.,* 268 Pa.Super. at 303, 408 A.2d at 477 (1979). We hold, therefore, that Detective Crowley was a proper affiant on the search warrant and had the authority to *obtain* it.

Essential to our analysis of whether Detective Crowley had the authority to *execute* the search warrant, are certain facts which are not in dispute:

1. Detective John Crowley was at all times relevant herein a county detective in the employ of the District Attorney of Montgomery County;

**11.** The comment to Pa.R.Crim.P. 2004 says that "no specific person need be designated in the warrant. However, only a law enforcement officer can properly serve a search warrant."

**12.** Now the President Judge of the Superior Court.

2. Appellant's apartment which was the subject of the search warrant is located in the city of Reading, Berks County;

3. The warrant was issued to Detective Crowley by District Justice George Graeff of the city of Reading;

4. The affiant as to probable cause was Detective Crowley;

5. The search of appellant's apartment, that is to say, the execution of the warrant, was conducted by Detective Crowley with assistance from Chief Hummel and Officer Clinton Stofflet of Douglas Township, Montgomery County;

6. Two police officers from the city of Reading, Detective Loren Young and Officer Wright, accompanied the officers from Montgomery County, and although they were present in appellant's apartment when the warrant was executed, *they did not participate in the search;* [13] and

7. The Return and Inventory of the *items* seized from appellant's apartment was prepared and signed by Detective Crowley.

The facts in *Commonwealth v. Kunkle, id.,* were stated in the opinion to be as follows:

In September 1975, Sergeant Freedman and Officer Martin of the Ross Township Police Department in Allegheny County received information that a lottery was being conducted at a certain residence in Shaler Township.[1] After an investigation, the officers appeared before a magistrate whose jurisdiction included Shaler Township, and applied for a search warrant. The magistrate issued the warrant, and the officers informed the

13. The Commonwealth-appellee's argument that because Reading police officers were present in the apartment, they had supervisory authority over the search and could protect their citizens from a search beyond the scope of the warrant, has absolutely no support in the record. The Reading police officers, who were present in appellant's apartment during the search, never testified and in fact their names are mentioned on just one occasion during this entire trial. (See N.T. Suppression Hearing, p. 32). For all we know, they may have been reading the newspaper, watching television or just talking about the weather. *What we do know is that they did not participate in the search.* (N.T. Suppression Hearing, p. 32).

Shaler Township Police Department of the pending search. Allegedly, the officers from the Shaler Township Police Department accompanied Freedman and Martin when the warrant was served and executed.[2] Evidence of gambling operations was discovered, and appellees were arrested and charged with gambling, poolselling, bookmaking and related offenses.

1. (footnote omitted)
2. The lower court found that Shaler Township police did in fact accompany Freedman and Martin. However, the suppression hearing record is silent on this point, except for an assertion by the district attorney during argument. N.T. at 7, 28.

*Id.* 268 Pa.Super. at 300–301, 408 A.2d at 475.

The appellees filed a motion to suppress the evidence alleging, among other things, that the warrant was defective for having been *issued* to police officers who were acting beyond their jurisdiction. The lower court agreed and suppressed the evidence. The Commonwealth appealed and as we have stated *supra*, this court overruled the lower court and held that the warrant could be *issued* to the non-jurisdictional police officers. Contrary to what appellant says, that was the only dispositive holding by this court in *Kunkle*. As a matter of fact, the matter was remanded to the lower court for another suppression hearing on appellee's remaining claims—one of which was that the *Kunkle* evidence should be suppressed because the warrant was *executed* by Freedman and Martin, the non-jurisdictional police.[14] Judge Spaeth noted in *Kunkel, id.*, 268 Pa.Super. at 302–303 n. 4, 408 A.2d at 476 n. 4, that "[w]e are not faced on this appeal with the issue of whether Freedman and Martin could legally participate in the service and execution of the search warrant by Shaler Township police officers, and if so, the extent to which they could legally participate. The lower court terminated the taking of testimony once it learned that Freedman and Martin were Ross Township police officers who had been issued a search warrant for a residence in Shaler Township. *Thus, the*

14. Our research fails to disclose what happened on remand. The case never again appeared in this court.

544

*record does not show how the warrant was executed;* more specifically, it does not show whether Freedman and Martin merely accompanied the Shaler Township police to the searched premises; whether they were the ones who actually served and executed the warrant while the Shaler Township police merely observed; or whether their participation fell between these extremes." (Emphasis added).

Thus, it is for us to decide whether a search warrant may legally be *executed* by non-jurisdictional police or, stated another way, must the officer *executing* the warrant have the authority to act as an officer where the warrant is *executed.* We have found no case in Pennsylvania or in any of our sister states squarely on point.

■ It is axiomatic that absent a grant of authority from the Legislature,[15] a law enforcement officer has no authority to arrest, with or without a warrant, outside his own municipal authority. *Commonwealth v. Silvers,* 286 Pa.Super. 161, 428 A.2d 622 (1981); *Commonwealth v. Bable,* 254

15. *See:* Act of March 3, 1860, P.L. 427, § 3, as amended, May 2, 1899, P.L. 73, § 1, 19 P.S. § 3 (Supp.1976–1977). (This Act authorizes the arrest *with warrant* by non-jurisdictional police in those situations where the proper issuing authority in governmental unit A in this Commonwealth issued a valid warrant of arrest to police authorized to act in governmental unit A for an offense committed therein and thereafter the person against whom the warrant is directed escapes, goes into, resides in, or is in any other governmental unit in this Commonwealth); Act of August 6, 1963, P.L. 511, No. 267. (This Act authorized police *in pursuit of felons* to arrest, with or without a warrant, beyond the territorial limits of the political subdivision in which the felony occurred); the Act of November 2, 1973, P.L. 330, No. 109. (This Act amended the Act of 1963, *id.,* to include, in addition to felonies, misdemeanors or summary offenses); Act of July 9, 1976, P.L. 791, No. 142, Chapter 89, Commencement of Proceeding, Subchapter A, General Provisions, 42 Pa.C.S.A. § 8901. (This chapter and section is essentially a rewrite of the Act of November 2, 1973, *supra* ); the Act of June 15, 1982, P.L. 512, No. 141, § 4, 42 Pa.C.S.A. § 8953(a) *et seq.,* Statewide Municipal Police Jurisdiction. (Interestingly, although not applicable at the time of appellant's arrest, this Act specifically repealed the Act of July 9, 1976, *supra,* and for the first time in this entire matter of municipal police jurisdiction, a provision is made for the extraterritorial service of a *search warrant* as well as an arrest warrant. *See* 42 Pa.C.S.A. § 8953(a)(1)(4). Clearly, the statewide jurisdiction of municipal police is substantially increased by this 1982 legislation.)

Pa.Super. 72, 385 A.2d 530 (1978); *Commonwealth v. England*, 474 Pa. 1, 375 A.2d 1292 (1977); *Commonwealth v. Davis*, 466 Pa. 102, 351 A.2d 642 (1976); *Commonwealth v. Fiume*, 292 Pa.Super. 54, 436 A.2d 1001 (1981); *Commonwealth v. Troutman*, 223 Pa.Super. 509, 302 A.2d 430 (1973).

Here, our immediate concern is not with the validity of an *extraterritorial arrest* but rather with the validity of the *extraterritorial service of a search warrant.* More specifically, should the rule be different when, as here, the execution of a search warrant is made by police in a jurisdiction where, although they have no power to act, they are accompanied by jurisdictional police who do have authority to act but do not participate in the search? As we have already indicated, we have found no cases in Pennsylvania on this point. There have been decisions in other jurisdictions which, while not on all fours, are instructive.

In the earliest case we have found, *Irwin v. State*, 147 Tex.Cr.R. 6, 177 S.W.2d 970 (1944) appellant was convicted of operating a policy game. As a result of a search of appellant's automobile and residence, evidence material to the state's case and incriminating the appellant with the offense charged was obtained and used by the state at trial. The search warrant was addressed to the "Sheriff or any constable of Harris County." The officers *executing the search warrant and making the search* were all police officers of the city of Houston. The officers' return upon the search warrant, showing the result of the search, was made by Houston police.

Among objections to the introduction of such testimony, it was urged that the officers (from the city of Houston) executing the search warrants and making the searches (in Harris County) were not authorized to do so, and that, as a consequence, the searches were illegal.

The state contended that since two of the Houston police officers conducting the search carried commissions as Special Deputies Sheriff of Harris County, they were at least

# 546

officers *de facto* of Harris County; consequently, their acts as officers were not subject to collateral attack.

Since it was never seriously contended that the two officers were *de jure* officers of Harris County, the sole issue was whether they were *de facto* officers. The Texas Court of Appeals held they were not deputies sheriff *de facto* of Harris County; therefore, their acts as such officers were void and of no binding effect. The court said:

> There is no question but that if the two named officers, or either of them, were deputies sheriff de jure or de facto, the search, in so far as the authority of the officers executing the search warrants was concerned, was legal. It is immaterial whether others unauthorized to execute the warrants were present and assisted in the searches under the direction of the deputies sheriff.
>
> . . . .
>
> In order for the searches to be legal, Officers Eubanks and Martindate, or either of them, were required to be deputies sheriff, because they could not have executed the warrants or made the searches thereunder, as policemen, outside the limits of the City of Houston, their territorial jurisdiction as policemen being restricted to the confines of that city. (citations omitted).

*Id.* 147 Tex.Cr.R. at 9–10, 177 S.W.2d at 972–73. The conviction was reversed.

There appears to be general agreement in the reported cases that where the search is conducted by jurisdictional police, the evidence seized will not be suppressed where non-jurisdictional police assist and participate in the search. *See: Keen v. State*, 626 S.W.2d 309 (Tex.Cr.1981); *State v. Cosgrove*, 181 Conn. 562, 436 A.2d 33 (1980); *State v. LeMatty*, 121 Ariz. 333, 590 P.2d 449 (1979)[16]; *State v. Wise*, 90 N.M. 659, 567 P.2d 970 (1977); *Reynolds v. State*, 506 S.W.2d 864 (Tex.Cr.App.1974); *Kirby v. Beto*, 426 F.2d 258 (C.A.5, 1970); *People v. Law*, 55 Misc.2d 1075, 287

**16.** The Arizona State Legislature had already withdrawn former territorial limitation of authority and provided that search warrants could be served by officers without reference to territorial jurisdiction.

N.Y.S.2d 565 (1968); *People v. Daily,* 157 Cal.App.2d 649, 321 P.2d 469 (1958); *Seay v. State,* 93 Okl.Cr. 372, 228 P.2d 665 (1951).

Although dicta, we find Judge Spaeth's reasoning in *Commonwealth v. Kunkel, supra,* 268 Pa.Super. at 302–303, 408 A.2d at 476 (1979); most persuasive. He said that since the officers serving the warrant had no official powers outside their own jurisdiction, the service was illegal under Pa.R.Crim.P. 2004. He went on to say that "although Rule 2004 stated somewhat ambiguously, that 'a search warrant shall be served by a law enforcement officer', the rule assumes, we believe, that the officer serving the warrant has authority to act as an officer at the place where the warrant is served, not at some other place."

We now hold that, just as in cases of arrest, unless there is a grant of authority from the Legislature, a law enforcement officer has no authority to execute a search warrant outside his own territorial jurisdiction. We also hold a search will not be violative of Rule 2004 where the non-jurisdictional police (who have no authority to act) are accompanied by jurisdictional police (with authority to act) who participate in the making and execution of the search, regardless of the degree of participation of the jurisdictional police. A search warrant is "executed" or "served" by making and conducting a search. Obviously, there can be no "execution" by police officers who do not participate in the search.

Since the Montgomery County police had no authority to conduct a search of appellant's apartment in the city of Reading, Berks County, and since the Reading police officers who accompanied the Montgomery police *did not participate in the search,* the search was illegal.

The introduction of evidence seized in appellant's apartment, which was material to the Commonwealth's case and incriminatory of appellant relative to the offense for which he was tried, was obtained by an illegal search of his apartment.

548

It follows, therefore, that the judgment of sentence is reversed and the case is remanded for a new trial.[17]

Jurisdiction is relinquished.

---

**17.** Since we have found the search of appellant's apartment to be illegal, his remaining claim of trial error in allowing, over objection, "expert" testimony as to the items seized in the apartment, is now rendered moot.