701 A.2d 492

COMMONWEALTH of Pennsylvania, Appellee,

v.

Thomas W. HAWKINS, Jr., Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 16, 1996.

Decided Sept. 17, 1997.

360

364

Michael G. Floyd, Penllyn, for T. Hawkins.

Bruce L. Castor, Jr., Patricia E. Coonahan, Norristown, Robert A. Graci, Harrisburg, for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

CASTILLE, Justice.

On June 7, 1993, this Court reversed appellant's judgment of sentence of death in connection with the June 4, 1989 death of the victim, Andrea Nicole Thomas, and remanded the

matter for a new trial.[1] After conducting a new trial, the jury again found appellant guilty of first degree murder[2] and indecent assault.[3] Following the penalty hearing on August 25, 1994, the jury found one aggravating circumstance[4] and no mitigating circumstances, and, as required by the law, set the penalty at death.[5] After the jury set the penalty, the trial court immediately imposed the jury's sentence of death.[6] On January 30, 1995, appellant's post-trial motions were denied by the trial court. This direct appeal followed. For the reasons expressed herein, we affirm the judgment of sentence imposed by the Court of Common Pleas of Montgomery County.

## I. SUFFICIENCY OF THE EVIDENCE

As is required in all cases where the death penalty has been imposed, this Court must conduct a review of the

1. On August 14, 1990, a Montgomery County jury found appellant guilty of first degree murder and indecent assault, charges arising from the death of the victim in this case. The jury set the sentence at death. On direct appeal, this Court reversed the judgment of sentence and remanded for a new trial because the trial court erred when it allowed the Commonwealth to introduce evidence of appellant's prior third degree murder conviction for the 1981 death of Karen Stubbs during the guilt phase of appellant's trial. This Court found that admission of this evidence constituted error because the prior third degree murder conviction and the present murder lacked sufficient similarity to show a common plan or distinct signature so as to render evidence of the prior murder admissible to prove that the present murder was the handiwork of appellant. See Commonwealth v. Hawkins, 534 Pa. 123, 626 A.2d 550 (1993).

2. 18 Pa.C.S. § 2502(a).

3. 18 Pa.C.S. § 3126.

4. The one aggravating circumstance unanimously found by the jury was that defendant had been convicted of another murder committed either before or at the time of the offense at issue. 42 Pa.C.S. § 9711(d)(11). Specifically, appellant pled guilty to third degree murder in 1981 for the death of Karen Stubbs.

5. If the death penalty is sought in connection with a first degree murder conviction, a jury is required to sentence a defendant to death if it unanimously finds at least one aggravating circumstance and no mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv).

6. With respect to appellant's indecent assault conviction, the trial court imposed a sentence of one (1) to two (2) years imprisonment to run consecutive to the sentence of death.

sufficiency of the evidence. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). When reviewing a sufficiency of the evidence claim, an appellate court, viewing all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth as the verdict winner, must determine whether the evidence was sufficient to enable the fact finder to find that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos,* 530 Pa. 473, 476, 610 A.2d 11, 13 (1992). Using this standard, the record below establishes the following evidence:

On the morning of June 4, 1989, the victim, a fourteen (14) year old girl, was at the home where she lived with her grandparents (who were also appellant's parents) and an aunt in Stowe, Montgomery County, Pennsylvania. Sometime between 7:45 a.m. and 8:15 a.m., the victim was left home alone after her grandparents had earlier left for a vacation in Florida and her aunt had left for work.

Appellant admitted to the police that he arrived at the victim's house at approximately 9:00 a.m. in order to pick-up the keys to his father's automobile. When appellant arrived at the house, the doors were locked. Thus, appellant proceeded to climb through a window in order to gain access to the house. Appellant admitted to the police that once inside he found the victim inside the house. Appellant also admitted that he played and wrestled with the victim because she had teased appellant about a split in his pants and a hole in his underwear. Appellant told the police that he left the house at approximately 9:45 a.m. to go to his place of employment in King of Prussia, Pennsylvania. The manager of the bagel shop where appellant was employed in King of Prussia testified that although appellant was scheduled to begin work at 10:30 a.m. that morning, he did not arrive for work until 1:30 p.m.

At approximately 5:00 p.m. on that same day, the victim's aunt returned home from work. The aunt noticed that the

front door was unlocked and that the living room was in disarray. After searching the house, the aunt discovered the victim's naked body and called the police.

The police arrived at the house shortly thereafter. The police observed that the victim's body was naked except for a brassiere pulled up over one of her breasts. Upon searching the house, the police observed that the living room was in disarray with various kitchen items strewn about and that there was a plastic garbage bag on the living room floor. The police also found the set of car keys that the appellant claimed were the reason that he went to the house. The black and white dress that the victim was wearing that morning, the victim's bloody underwear, and various blood and fecal stains were also found at the scene.

A forensic pathologist's examination of the victim revealed that the victim's body had vaginal bruises, scrapes and tears consistent with sexual penetration. The pathologist also concluded that the victim's death was caused by strangulation by ligature consistent with that of a telephone extension cord found inside the house near where the victim was killed. The pathologist also noted that the victim had three stab wounds in her back which were consistent with a two-pronged fork found by investigators in the bathroom of the house. The pathologist concluded that the manner of death was a homicide and that death occurred sometime between 9:00 a.m. and 12:00 noon on June 4, 1989.

Certain items of physical evidence removed from the scene were processed which implicated appellant in the murder. Specifically, latent fingerprints were found on the plastic garbage bag found in the living room and those fingerprints were determined to match those of appellant. Also, the police recovered a black fiber from the dress the victim was wearing that day. A Federal Bureau of Investigations Agent testified that the black fiber found on the dress was consistent with the thread on the pair of black pants that appellant admitted wearing the day of the murder. Moreover, samples of saliva taken from the victim's breasts matched a saliva sample taken from appellant. A federal agent testified that the saliva which

matched that of appellant statistically could have only belonged to one (1) out of every one hundred and forty-three (143) African Americans and one (1) out of every five hundred (500) Caucasians.

On September 21, 1989, by coincidence, police from another county were executing a search warrant at appellant's home in connection with an unrelated matter and the police observed eighty one detective magazines and books concerning investigative techniques used in crimes. The magazines and books had numerous pages folded and textual highlights. This evidence was turned over to Montgomery County detectives and introduced at appellant's trial by the Commonwealth in order to explain the scarcity of forensic evidence at the murder scene.

Finally, Malcolm Tucker and Michael Murphy,[7] two inmates who were incarcerated with appellant, testified at trial that appellant told them that the victim often teased him sexually and that according to appellant, "[s]he asked for it, so I choked her and f——d her brains out." The two inmates also testified that appellant told them that the police found his detective magazines with markings and that he marked the magazines so that he could profit from the mistakes made by others while he was committing crimes.

In first degree murder cases, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). When there is no direct evidence of intent to kill, the fact-finder may glean the necessary intent from the act itself and from all surrounding circumstances. *Commonwealth v. Meredith*, 490 Pa. 303, 311, 416 A.2d 481, 485 (1980). Specific intent to kill can be proven where the defendant knowingly applies deadly force to

7. Malcolm Tucker's testimony from appellant's first trial was read into the record because he died between the first and second trial.

the person of another. *Id.* Death caused by strangulation is sufficient to infer the specific intent required for a conviction of first degree murder. *See Commonwealth v. Simmons,* 541 Pa. 211, 227–28, 662 A.2d 621, 628–29 (1995), *cert. denied,* 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996) (evidence of manual strangulation of victim sufficient to establish specific intent required for first-degree murder).

■ Here, the evidence presented at trial showed that appellant himself admitted being in the victim's house during the time of the murder. Also, the physical evidence seized from the murder scene such as the fiber on the victim's dress, the fingerprint on the plastic garbage bag, and the saliva evidence from the victim's breast inculpated appellant with the murder. Moreover, two inmates incarcerated with appellant testified about incriminating statements appellant made to them admitting the murder. Finally, the victim's body showed that her death was caused by strangulation with a telephone extension wire similar to one found in the victim's house. Accordingly, we find that this evidence is sufficient to establish that appellant acted with malice aforethought and with the specific intent to kill the victim. *See Simmons,* 541 Pa. at 228–29, 662 A.2d at 630 (circumstantial evidence which established that defendant had access to the victim's home; was placed at the victim's home during the time of the murder; was linked to the murder scene by physical evidence; and told others of the murder was sufficient to support guilty verdict against defendant for first degree murder).

## II. *WEIGHT OF THE EVIDENCE*

Appellant contends that his conviction was against the weight of the evidence because of conflicts and inconsistencies in the testimony and the evidence presented at trial. Inconsistencies noted by appellant include: (1) that the presence of his fingerprints at the crime scene would not be unusual since the evidence came from his parent's house; (2) appellant's forensic expert testified that there was a mixture of saliva on the victim's left breast which would indicate that appellant was not involved with the crime; and (3) appellant's two alibi

witnesses established that appellant was at his Philadelphia residence within a time frame consistent with appellant's statement that he left his parent's house on the day of the murder at 9:45 a.m.

The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Jackson,* 506 Pa. 469, 475, 485 A.2d 1102, 1104 (1984). An appellate court cannot substitute its judgment for that of the finder of fact. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982). Thus, we can only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Whitney,* 511 Pa. 232, 239, 512 A.2d 1152, 1155 (1986).

After examining the evidence in this case, we find that appellant's assertion that the inconsistencies in the evidence resulted in a verdict that shocked one's conscience to have no merit since the inconsistencies claimed are only minor and the witness' credibility is solely for the jury to determine. *See Simmons, supra* at 229–30, 662 A.2d at 630 (verdict not against weight of evidence where matters complained of amounted to nothing more than minor inconsistencies in testimony and claims of credibility). Thus, after examining the evidence in this case, we find nothing to support appellant's assertion that his conviction was against the weight of the evidence. Accordingly, this claim is rejected.

## III. *DOUBLE JEOPARDY*

Before appellant was retried, he filed a motion to preclude a new trial based on double jeopardy because of prosecutorial misconduct which appellant asserts was intended to invoke either a mistrial or to deny a fair initial trial. Specifically, appellant alleges that the Commonwealth engaged in misconduct by violating *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed before his first trial to disclose the nature of agreements it had reached with

Michael Murphy and Malcolm Tucker whereby these witnesses would receive favorable sentencing treatment in exchange for their testimony in appellant's trial. Appellant also alleges that prosecutorial misconduct occurred in the first trial when the Commonwealth made repeated references during its closing argument that appellant had failed to prove that someone else committed the murder.

Under the double jeopardy clause of the Pennsylvania Constitution,[8] a defendant cannot be retried if prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial or if the conduct of the prosecutor is intentionally undertaken to prejudice a defendant so that he does not receive a fair trial. *Commonwealth v. Smith*, 532 Pa. 177, 186, 615 A.2d 321, 325 (1992). In order to raise double jeopardy implications, the prosecutor's misconduct must have been deliberate, undertaken in bad faith and with a specific intent to deny the defendant of a fair trial. *Commonwealth v. Chambers*, 546 Pa. 370, 379–81, 685 A.2d 96, 101 (1996).

Appellant first contends that double jeopardy should apply because the Commonwealth intended to deprive him of a fair trial by violating *Brady, supra*, when it failed to disclose the existence of agreements with the two inmates who testified about inculpatory statements appellant made about the murder while in prison. Appellant contends that the failure to fully disclose these agreements deprived him of crucial impeachment evidence at his first trial.

As to Michael Murphy, he pled guilty before appellant's first trial to charges of burglary and risking a catastrophe. On June 27, 1990, Murphy received a sentence of eighteen (18) to thirty-six (36) months imprisonment for the risking a catastrophe charge and five (5) years probation for the burglary charge. The Commonwealth agrees that this particular sentence falls below the relevant sentencing guidelines. However, the trial judge who sentenced Murphy testified at a pretrial hearing that he was unaware at the time of sentencing that Murphy was a potential witness in appellant's first trial

**8.** Article I, § 10.

which was scheduled to begin in August of the same year. Instead, the trial judge testified that he imposed a sentence below the guidelines because he found three mitigating factors present.[9] Also, the Commonwealth has consistently represented that it did not enter into any plea agreement and that it has no material in its files pertaining to any such plea agreement. *See Commonwealth v. Colson,* 507 Pa. 440, 462, 490 A.2d 811, 822 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (Commonwealth does not violate disclosure requirements of *Brady* by failing to disclose evidence that it does not have and of which it is not aware). Under these circumstances, we decline to find that prosecutorial misconduct occurred based on a *Brady* violation since appellant offers nothing other than his mere conjecture that such an arrangement existed. Thus, appellant's double jeopardy claim based on the Commonwealth's failure to disclose a lenient plea agreement with Murphy must fail.

As to Malcolm Tucker, he was convicted before appellant's first trial for the rape of his two daughters. The trial judge in this matter *sub judice* was also the trial judge who sentenced Tucker to sixteen (16) to thirty-five (35) years imprisonment before appellant's first trial. The trial judge stated on the record in this matter that he was unaware that at the time he sentenced Tucker, that Tucker was to be a witness in appellant's first trial. The trial judge also stated that this sentence exceeded the aggravated range under the sentencing guidelines. Moreover, the Commonwealth has consistently maintained that it has no record reflecting any plea agreement with Tucker and that it never promised Tucker leniency in return for his testifying against appellant. Under these circumstances, we decline to find that prosecutorial misconduct based on a *Brady* violation occurred since appellant again offers nothing other than mere conjecture that such an arrangement existed. Thus, appellant's double jeopardy claim based on the

9. The judge who sentenced Murphy found the following mitigating factors: (1) Murphy pled guilty; (2) Murphy's actions were related to a drug problem; and, (3) Murphy pled guilty to a crime which the police admitted that they were about to label unsolved.

Commonwealth's failure to disclose a leniency agreement with Tucker must fail.

Appellant also argues that the trial court erred in denying his double jeopardy motion on the grounds that comments by the prosecutor at his first trial improperly shifted the burden of proof onto appellant and that these comments were made with the intention of denying appellant a fair trial. During opening statements, appellant's counsel stated that the defense would prove that someone other than appellant murdered the victim. After no such evidence was presented by the defense at appellant's first trial, the prosecutor made the following statement concerning appellant's failure to prove this fact:

> [N]ow, if you believe that I have proven those things, then I'm going to suggest to you that you convict the defendant. If I didn't prove those things, and Mrs. Brown [appellant's trial counsel] has proven the things that she said she'd prove, I suggest to you that you acquit the defendant. But let's look at what was proven and what was not. Now, Mrs. Brown gave an opening statement. Now remember what we say is not evidence, and if I say something is a fact, and you don't believe its a fact, then your recollection is what controls, not mine ... Now, what did Mrs. Brown say? She promised you members of the jury, she promised you that she would prove that someone else committed this crime. Who? She has not given you one other possible person who committed this crime, not one. And she promised you that she would and she failed.

(N.T. 8/14/90 at 62–64).

Generally, comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. D'Ambro*, 500 Pa. 303, 309–10, 456 A.2d 140, 144 (1983). Prosecutorial misconduct will not be found where comments were based on the evidence or

374

proper inferences therefrom or were only oratorical flair. *Commonwealth v. Marshall,* 534 Pa. 488, 509, 633 A.2d 1100, 1110 (1993). Moreover, allegedly improper comments by a prosecutor must be examined within the context of defense counsel's conduct. *Commonwealth v. Clayton,* 516 Pa. 263, 284, 532 A.2d 385, 396 (1987), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988).

Here, the prosecutor's comments were in response to appellant's counsel's statement that she was going to prove that someone other than the appellant committed the murder. Having "opened the door" to this subject, appellant cannot now complain because the prosecutor chose to further comment on what was behind that door. *See Commonwealth v. Yarris,* 519 Pa. 571, 597, 549 A.2d 513, 526 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 708 (1989) (prosecution's inquiry as to why defendant's good friend, with whom defendant testified he allegedly spent the day of the murder, did not testify, did not impermissibly shift burden of proof to defendant); *Commonwealth v. Jubilee,* 403 Pa.Super. 589, 594, 589 A.2d 1112, 1114, *appeal denied,* 529 Pa. 617, 600 A.2d 534 (1991) (prosecutor's challenge to defense failure to produce witness mentioned in defense opening statement not improper). Also, any prejudicial effect from the prosecutor's statement was cured by the trial court's general cautionary instruction to the jury following closing arguments that none of the closing arguments were evidence and that the Commonwealth always bore the burden of proof and that the defendant did not have to prove that he is not guilty. Our law presumes that juries follow the court's instructions as to the applicable law. *See Commonwealth v. Baker,* 531 Pa. 541, 559, 614 A.2d 663, 672 (1992). Thus, because the prosecutor's comments at the first trial were neither improper nor denied appellant of a fair trial, we conclude that the trial court correctly denied appellant's double jeopardy motion on this ground.

## IV. *CHANGE OF VENUE*

Appellant next argues that the trial court erred in refusing to grant his motion for a change of venue because of

prejudicial pre-trial publicity. Appellant contends that the pre-trial publicity concerning this murder, appellant's first trial for this murder and appellant's prior criminal record was so sustained, pervasive, inflammatory and inculpatory from the date of his arrest to the time of his trial that a change of venue was required even without the need to show any actual prejudice.[10] We disagree.

The determination of whether to grant a change of venue rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Commonwealth v. Rucci*, 543 Pa. 261, 283, 670 A.2d 1129, 1140 (1996). As a general rule, appellant must demonstrate that pre-trial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. *Id.* In order for pre-trial publicity to be presumptively prejudicial, the publicity must: (1) be sensational, inflammatory, slanted towards conviction rather than factual and objective; (2) have revealed that the accused had a prior criminal record or referred to confessions, admissions or reenactments of the crime by the accused; or, (3) have been derived from reports from the police and prosecuting officers. *Commonwealth v. Gorby*, 527 Pa. 98, 108, 588 A.2d 902, 906 (1991). However, even if one of these elements exists, a change of venue will not be necessary where there has been a sufficient time between the publication and the trial for the prejudice to dissipate. *Commonwealth v. Pursell*, 508 Pa. 212, 221, 495 A.2d 183, 187 (1985).

Although some of the articles which appellant attaches to his brief do refer to appellant's prior criminal history, we cannot conclude that the publicity was so extensive, sustained and pervasive that the community must have been deemed to be saturated to the point that the impaneling of a impartial jury was impossible. This is especially true in this matter because the trial court fortuitously issued a gag order nine

10. Pa. R.Crim. P. 312(a) provides:
(a) All motions for a change of venue or change of venire shall be made to the court in which the case is currently pending. Venue or venire may be changed by that court when it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending.

months before the start of this trial directing the parties from discussing the case in the press. This order had the effect of producing a "cooling off period" in the pre-trial publicity. The articles appellant attaches to his brief were published near the *voir dire* phase of this trial and were factual in nature rather than containing prejudicial or inflammatory material slanted against appellant. *See Pursell, supra* (six month "cooling off" period from last prejudicial publicity and trial sufficient to dissipate any prejudice engendered by such publicity).

Moreover, our independent review of the seven hundred and eighty-four (784) pages of extensive *voir dire* examination wherein ninety-five (95) jurors were questioned demonstrates that a change of venue was not required. Of the 95 potential jurors examined, two (2) venirepersons had a detailed knowledge of this case that caused them to form a fixed opinion of appellant, thirteen (13) venirepersons had such a small amount of knowledge that they had no fixed opinions as to appellant's guilt or innocence, and the remaining eighty (80) venirepersons had no knowledge of this case at all. Of the twelve (12) jurors and four (4) alternates selected for appellant's trial, only one person possessed even a small amount of knowledge of appellant's case and that person testified that what little she knew would not affect her ability to be fair and impartial. The results of the *voir dire* examination lead us to conclude that the community was not saturated to the point that an impartial jury could not be impaneled. *See Gorby,* 527 Pa. at 109, 588 A.2d at 907 (no proof of presumptive prejudice even though 34 out of 70 potential jurors knew something about the case). Thus, we cannot conclude that the trial court abused its discretion in denying appellant's motion for a change of venue. Accordingly, this claim is rejected.

### V. *SUPPRESSION OF INFORMANTS' TESTIMONY*

Appellant next argues that the trial court erred by not suppressing the inculpatory statements related by appellant to Tucker and Murphy, two inmates incarcerated with appellant, on the grounds that the statements were obtained in violation of appellant's Sixth Amendment right to counsel as

guaranteed by the United States Constitution. Appellant asserts that his Sixth Amendment rights were violated because Tucker and Murphy were acting as agents of the police when they questioned appellant about the murder without appellant's legal counsel being present.

 Our standard or review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Cortez*, 507 Pa. 529, 532, 491 A.2d 111, 112 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Cortez*, 507 Pa. at 532, 491 A.2d at 112.

 Information secured by an informant acting as an agent of the government must be suppressed where the informant acts under instructions as an informant for the government, where he presents himself as no more than a fellow inmate rather than a governmental agent, and where the suspect is in custody and under indictment at the time of the questioning by the informant because such questioning outside the presence of the accused's counsel violates the accused's Sixth Amendment right to counsel. *Commonwealth v. Berkheimer*, 501 Pa. 85, 88, 460 A.2d 233, 234 (1983). In order to prove such a violation, the defendant must demonstrate that the police and the informant took some action, beyond mere listening, which was designed deliberately to elicit incriminating remarks. *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2629–30, 91 L.Ed.2d 364 (1986). Moreover, the defendant must show that the informant was acting as an agent of the government. Individual acts do not become imbued with the character of governmental action

merely because they are later relied upon and used by the government in furtherance of governmental objectives. *Commonwealth v. Corley*, 507 Pa. 540, 547, 491 A.2d 829, 832 (1985).

Here, the trial court found that the police some time before May 4, 1990 interviewed the inmates in appellant's cell block regarding any information they may have overheard from defendant. On May 4, 1990, inmate Murphy, not acting under any agreement with the police, initiated his first contact with Montgomery County detectives. On May 5, 1990, appellant himself approached inmate Tucker to ask Tucker about aiding appellant in his murder defense since Tucker was previously a private investigator with contacts outside of prison. Tucker had a discussion with appellant in which appellant made incriminating statements about the murder. Tucker obtained this information by asking appellant questions. Murphy, who was in the cell next to appellant, never asked appellant any questions and only testified at appellant's trial about the conversation he overheard between appellant and Tucker. The trial court found that neither Tucker nor Murphy were promised anything by the Montgomery County detectives for their cooperation. The trial court also found that neither Tucker nor Murphy were given any information by the police concerning the murder which would have enhanced their ability to solicit information from appellant and that neither man was instructed by the Montgomery County detectives to seek information from appellant. Moreover, the trial court found that neither informant was intentionally placed in a cell near appellant in order to aid in the investigation.

Based on these findings by the trial court, which are supported by the record, we conclude that the trial court correctly held that the testimony of the two informants should not be suppressed because neither was acting as an agent of the government. Rather, the record demonstrates that the two informants acted on their own initiative without the benefit of any promise or reward by the Commonwealth. Thus, appellant's Sixth Amendment rights were not violated and the testimony of the two informants was properly admit-

ted at trial. *See Commonwealth v. Rhoades,* 364 Pa.Super. 54, 527 A.2d 148 (1987), *appeal denied,* 521 Pa. 611, 557 A.2d 343 (1989) (not violation of defendant's Sixth Amendment rights where incriminating statements made to prison inmate who was acting on his own initiative and without promise of benefit from Commonwealth and who had been placed in adjoining cell by happenstance and not design). Accordingly, this claim must fail.

## VI. *SUPPRESSION OF DETECTIVE MAGAZINES AND BOOKS*

Appellant next argues that the trial court erred in denying his motion to suppress the eighty-one (81) magazines and books found during the search of appellant's residence. Appellant contends that these items should have been suppressed since they were seized by authority of an invalid search warrant issued in another county and that the items never should have been transferred to the Montgomery County authorities.

As noted above, when reviewing the denial of a suppression motion, we consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Cortez,* 507 Pa. at 532, 491 A.2d at 112. Moreover, when reviewing the validity of a warrant, this Court has stated that:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all of the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Commonwealth v. Weidenmoyer,* 518 Pa. 2, 8, 539 A.2d 1291, 1294 (1988).

380

Here, a search warrant was issued in Delaware County authorizing the search of appellant's residence in Philadelphia in connection with the suspected murder of Dawn Mazio. The facts in the affidavit presented to obtain the search warrant show that Dawn Mazio disappeared after leaving work on May 22, 1989. Unlike her other absences from work, Dawn Mazio did not inform her supervisors that she was going to miss work that next day. The Radnor Township Police, as part of their investigation, interviewed appellant on June 1 and June 11, 1989, because they found appellant's name in Mazio's address book. During the interviews, appellant informed the police that he had not seen Mazio in almost two months, that he was previously convicted for a gang related murder of another woman, that Mazio told appellant that she could help him get a janitorial position at the hospital, and that Mazio was angry at him for failing to appear at an interview she scheduled for him and for his failure to meet her at a bus after she finished work on May 12, 1989. All of these statements subsequently proved to be false.[11] Additionally, a witness stated that she saw Mazio and a man who closely resembled appellant on the day of Mazio's disappearance. Based on the totality of the circumstances presented, we find that the issuing magistrate had a proper basis for concluding that probable cause existed for suspecting that appellant was involved in the possible murder of Dawn Mazio. Thus, the search warrant that resulted in the seizure of the magazines and books from appellant's residence was lawful in that the items had some relevance to the possible murder of Mazio and they were properly seized (See discussions *infra* at Section XIII for a discussion of appellant's claim concerning sending this material to the jury room).

Moreover, the fact that Delaware County subsequently transferred these magazines and books to Montgomery County does not provide grounds for suppressing these items.

11. These statements by appellant to the police were false since his previous murder conviction was not gang related, the hospital had no record of an interview being scheduled with appellant or that Mazio had mentioned appellant, and that Mazio never worked on May 12, 1989.

*See Commonwealth v. Mason,* 327 Pa.Super. 520, 540, 476 A.2d 389, 399 (1984) (items lawfully seized by police in Northumberland County as evidence of crime in that county which were subsequently turned over to police in Montgomery County for an unrelated crime were not subject to suppression by court in Montgomery County). Therefore, we conclude that the trial court correctly denied appellant's motion to suppress the detective magazines and books. Accordingly, this claim must fail.

## VII. *LAY OPINION TESTIMONY*

Appellant next argues that the trial court erred when it permitted a lay witness to testify as to an ultimate issue of fact pertaining to how appellant's fingerprints were placed on the plastic garbage bag found on the living room floor at the murder scene. Specifically, appellant objects to the following statement of Chief Detective Oscar Vance before the jury regarding his investigative interview of appellant and appellant's possible explanation for how appellant's fingerprints came to be found on the plastic garbage bag:

He [appellant] said that if his fingerprints were on the trash bag that somebody must have put them there. At that time I told him that it was impossible for anyone—

Appellant's trial counsel then immediately objected to this testimony and the trial court sustained the objection.

We note that the jury was earlier instructed by the trial court in its opening instructions that a response to a question which is objected to and sustained does not become evidence. The jury is presumed to follow the trial court's instructions. *Baker,* 531 Pa. at 559, 614 A.2d at 672 (our law presumes that juries follow the court's instructions as to the applicable law). Thus, based on the circumstances surrounding this testimony, we do not find that the trial court admitted the opinion testimony of a lay witness on an ultimate issue of fact. Accordingly, this claim is rejected.

## VIII. *HEARSAY EVIDENCE—STATE OF MIND*

 Appellant next argues that the trial court erred in refusing to allow the victim's grandfather to testify that the victim intended to go to a party on the day of the murder and that she was to be picked up by an unknown person. Appellant asserts that this testimony which was excluded by the trial court should have been admitted under the state of mind hearsay exception. Specifically, appellant objects to the court's disallowance of the following testimony by the victim's grandfather:

Q: Now, prior to your leaving, did you speak to Andrea at all?

A: Yes, I did.

Q: Is it my understanding that she was going to a picnic that day?

A: Right.

Q: Did you ask her anything?

A: Yes, I asked her how she was going to get there.

Q: What did she tell you?

MR. CASTOR [the prosecutor]: Objection.

THE COURT: Sustained.

(N.T. 8/18/94 at 734).

 Admissibility of evidence is a matter addressed to the sound discretion of the trial court, which may only be reversed upon a showing that the court abused its discretion. *Commonwealth v. Claypool,* 508 Pa. 198, 495 A.2d 176, 178 (1985). Pennsylvania recognizes a state of mind hearsay exception because determining one's state of mind is often impossible without such statements and such statements are presumed reliable because of their spontaneity. *Commonwealth v. Thornton,* 494 Pa. 260, 265, 431 A.2d 248, 251 (1981). However, state of mind evidence must still meet the test of relevance. As this Court has stated,

Determination of the relevancy of evidence offered at trial requires a two-step analysis. It must be determined first if the inference sought to be raised by the evidence bears

upon a matter in issue in the case and, second, whether the evidence renders the desired inference more probative than it would be without the evidence.

*Thornton,* 494 Pa. at 265, 431 A.2d at 251.

Assuming, arguendo, that the trial court should have admitted this testimony, no new trial is warranted because any resulting error was harmless since appellant cannot show he suffered any prejudice. Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Williams,* 524 Pa. 404, 573 A.2d 536 (1990). Here, appellant asserts that this evidence would have shown that the victim was scheduled to be driven to a party by an unknown acquaintance. The victim's grandmother testified that the victim was supposed to attend a graduation party on the afternoon of the murder. The grandfather also testified that he gave the victim money for the party and that she would need a ride to the party. Moreover, the evidence established that no one living at the victim's house could have given her a ride to the party since the grandparents left for vacation and the victim's aunt was at work. Thus, the excluded testimony was merely cumulative in that other evidence was admitted which established that which the grandfather would have testified about. Appellant fails to establish how the exclusion of this evidence caused him prejudice. Accordingly, we conclude that any possible error resulting from the exclusion of the grandfather's testimony as to what the victim intended to do on the day of the murder was harmless.

## IX. *EXCLUSION OF DNA TESTIMONY*

Appellant next argues that the trial court erred when it precluded appellant's forensic expert from testifying

about DNA testing on substances found underneath the victim's fingernails. Appellant asserts that his expert would have testified that the DNA material found underneath the victim's fingernails was not consistent with that of either appellant or the victim.

The trial court here precluded this expert testimony because it found that no facts of record which supported a conclusion that any substance was found underneath the fingernails of the victim. However, the record demonstrates that prior to the testimony of appellant's expert, the victim's father testified that he had observed particles underneath the victim's fingernails when he identified the victim's body at the hospital. Thus, the trial court incorrectly found that there were no facts of record which would support appellant's line of questioning regarding the victim's fingernails and DNA evidence. *See Tobash v. Jones,* 419 Pa. 205, 212, 213 A.2d 588, 590 (1965) (expert testimony may be based on testimony adduced by one of the parties made known to the expert either by the expert having heard it or by having it read to him, and for which, for purposes of his expert opinion, he assumed to be true).

Even though the trial court should have allowed the questioning concerning DNA evidence discovered from the victim's fingernails, we find this error to be harmless in light of the fact that other DNA testing results were admitted which resulted in similar findings by appellant's expert witness. The record demonstrates that the trial court allowed into evidence the testimony of appellant's expert that he concluded with a reasonable degree of scientific certainty that his other DNA testing demonstrated that neither appellant nor the victim was the donor of any DNA material extracted from swabs of the victim's breasts and thighs. Moreover, appellant does not demonstrate how the exclusion of this evidence caused him to suffer prejudice. Appellant's counsel was able to argue the lack of the fingernail evidence to the jury and to use the Commonwealth's failure to analyze such evidence as a reason for reasonable doubt in closing argument to the jury. Not only would the excluded evidence have been

cumulative, but appellant was able to turn the exclusion of this evidence to his advantage. Therefore, we conclude that any error in the trial court's ruling on this issue was harmless. Accordingly, this issue must fail.

## X. *PRE-ARREST SILENCE*

■ Appellant next argues that the prosecution violated his Fifth Amendment privilege against self-incrimination by eliciting testimony from a police officer concerning appellant's "tacit admission" in the course of questioning regarding the victim's death. On June 5, 1989, one day after the victim's murder, appellant submitted to a formal interview by a Montgomery County detective at the Philadelphia Police Administration Building. Appellant admits that he was not under arrest for the matter involved *sub judice* when he submitted to this interview.[12] At appellant's trial, the prosecution asked the police officer to recount his formal interview with appellant. The relevant portion of the testimony concerns the following exchange:

Q [by the prosecutor]: I'll repeat the question. Did you ever directly ask the defendant if he murdered Andrea Thomas?

A: Yes.

Q: What was his reaction?

A: First he asked me did I think that he killed his niece and I said yes. Then his hands were on the side of the chair sitting like this, he bowed his head, and there was a pregnant pause. And I said, "You killed her, didn't you?"

MR. FLOYD [appellant's counsel]: Objection, move for a mistrial.

THE COURT: Overruled.

THE WITNESS: And he kept his head down for about 30 seconds, raised his head and said, "I didn't hurt Andrea."

(N.T. 8/16/94 at 350).

■ Evidence of a defendant's silence in refusing to deny guilt after an accusation of guilt has been made (often

---

**12.** Appellant was not arrested until March of 1990, approximately nine months after he submitted to the formal interview at issue.

referred to as a tacit admission) is generally not admissible where the silence occurred while the defendant is in police custody because a contrary policy would effectively vitiate a defendant's constitutionally guaranteed right against self-incrimination. *Commonwealth v. Dravecz*, 424 Pa. 582, 227 A.2d 904 (1967). However, this principal of not allowing evidence of a tacit admission by the defendant does not extend to instances where the defendant does not choose to remain silent but instead volunteers responses to police questioning.

Here, appellant had waived his right to remain silent. As part of the questioning following this waiver, the investigating detective accused appellant of killing the victim. Appellant, after contemplating the accusation for approximately 30 seconds, denied his guilt in an equivocal fashion. To that extent, the introduction of his statement does not constitute a Fifth Amendment violation. Once appellant chose to make a response, that response, and the circumstances surrounding the response, were properly made available for the jury's consideration in evaluating the credibility of the verbal denial based on a contemporaneous non-verbal act. *Commonwealth v. Jermyn*, 516 Pa. 460, 474–75, 533 A.2d 74, 80–81 (1987) (defendant's equivocal response to police officer's accusation that defendant committed the crime was admissible since the response was not a tacit admission and the evasiveness of the answers could be utilized by the jury in determining credibility and drawing inferences therefrom). Therefore, the trial court properly allowed the Montgomery County detective's testimony concerning appellant's response and reactions when he was asked whether he killed the victim. Accordingly, this claim must fail.

## XI. *PROSECUTORIAL MISCONDUCT—GUILT PHASE*

Appellant next argues that the prosecutor committed prosecutorial misconduct by making two improper remarks during closing argument at trial. In reviewing a claim of improper prosecutorial comments, our scope of review is whether the trial court abused its discretion. *Simmons,* 541 Pa. at 246, 662 A.2d at 638–39. As noted above, comments by

a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. D'Ambro,* 500 Pa. at 309–10, 456 A.2d at 144. Moreover, allegedly improper comments by a prosecutor may be examined within the context of defense counsel's conduct. *Commonwealth v. Clayton,* 516 Pa. at 284, 532 A.2d at 396. We note that this is a relatively stringent standard against which appellant must labor. *Commonwealth v. LaCava,* 542 Pa. 160, 181, 666 A.2d 221, 231 (1995).

██ Appellant first claims that the prosecutor improperly shifted the burden of proof to appellant when it commented on appellant's failure to prove that someone other than appellant left saliva on the victim. In his opening argument, appellant's counsel stated that the facts from which the jury would acquit appellant would come "right out of his [prosecutor's] case" since the evidence would show that two different types of saliva were left on the victim indicating that two people rather than appellant committed the crime. This theory was also argued in closing argument by appellant's counsel. In response to this argument, the prosecutor stated in his closing argument that:

Now remember the opening statements. I know it was a long time ago ... Mr. Floyd also elected to give an opening statement. Remember, he doesn't have to prove anything; however, if he tells you he is going to prove something, you hold him to that. And he told you—I almost fell off my chair—he told you in almost these words, but Mr. Castor didn't tell you that on the other breast was someone else's saliva, and I will prove through his own witnesses that it was someone else who left that saliva there. I didn't hear that. That never happened. That was a complete, erroneous statement.

(N.T. 8/23/94 at 310–11).

██ Here, the prosecutor clearly stated in his comments that appellant never bore any burden of proof. Also, the

prosecutor's comments were in response to appellant's counsel's statement that he was going to take the Commonwealth's evidence and prove that two other people rather than appellant committed the murder, an argument which appellant's counsel repeated in his closing argument to the jury. Thus, the prosecutor's comments were a fair response to appellant's counsel's jury arguments. *See Jubilee, supra* at 594, 589 A.2d at 1114 (prosecutor's challenge to defense failure to present evidence in accord with defense counsel's opening statement not improper). Moreover, any prejudicial effect from the prosecutor's statement was cured by the trial court's general cautionary instruction to the jury following closing arguments that none of the closing arguments were evidence and that the Commonwealth always bore the burden of proof because defendant did not have to prove that he is not guilty. *See Baker,* 531 Pa. at 559, 614 A.2d at 672 (our law presumes that juries follow the court's instructions as to the applicable law). Therefore, because the prosecutor's comments were a fair response to appellant's counsel's argument and the remark did not have the effect of forming a fixed. bias or hostility toward appellant so that the jury could not render a true and impartial verdict, we conclude that the trial court did not abuse its discretion by concluding that the prosecutor's remarks were proper. Thus, this claim of prosecutorial misconduct must fail.

 The other closing statement at trial which appellant contends was improper involved the prosecutor placing his credibility before the jury for the purpose of bolstering the testimony of a witness. The closing argument complained of relates to the prosecutor's contrast of the chain of custody of blood samples taken and tested by the Commonwealth and appellant. The prosecutor argued as follows:

> You could have had Dr. Bing [appellant's forensic expert] test the known blood of the victim. He didn't do that. Is that sloppy? You bet it is, I suggest. Also, you didn't have anybody come in here and say, I drew the blood from the defendant. Now, one thing you do have is in evidence. You have Commonwealth's Exhibit C–10 which is the known

blood of the defendant taken the night of the crime. How do we know whether they were labeled properly? How do we know whether it was packaged properly? How do we know whether it was contaminated between the drawing and when they got it to the laboratory? Remember, the evidence that my detectives took up there, they actually took it there, and I will vouch that it wasn't tampered with in the interim.

(N.T. 8/23/94 at 331–32).

 It is well-settled that it is improper for a prosecutor to express a personal belief or opinion as to the guilt of the defendant or the credibility of the defendant and other witnesses. *Simmons*, 541 Pa. at 247, 662 A.2d at 639. However, such comments by the prosecutor will not constitute reversible error unless the unavoidable effect is to prejudice the jury so that they could not weigh the evidence and render a fair and impartial verdict. *Commonwealth v. Anderson*, 501 Pa. 275, 282, 461 A.2d 208, 211 (1983).

Here, the prosecutor's comments were not an expression of his personal opinion as to appellant's guilt or to the credibility of any one particular witness. Rather, the prosecutor was attempting to contrast the methods used to assure the proper chain of custody of blood samples taken separately by the Commonwealth and by the appellant for scientific testing. Even though the prosecutor's usage of the word "vouch" may have been unwise, our examination of the entire context in which this statement occurred leads us to conclude that it did not form a fixed bias or hostility in the minds of the jury towards appellant since there was sufficient other evidence presented at trial as to the chain of custody of the Commonwealth's evidence. *See Anderson, supra* (prosecutor's characterization of defendant's statement that he was an innocent bystander to murder was a fairytale was improper; however, it did not amount to reversible error since defendant was not prejudiced by the remark). Moreover, appellant was not prejudiced by the remark since the trial court instructed the jury in its general cautionary instruction following closing arguments that none of the closing arguments were evidence

since the jury is the sole finder of facts from the evidence presented at trial and the sole judge of a witness' credibility. *See Baker,* 531 Pa. at 559, 614 A.2d at 672 (our law presumes that juries follow the court's instructions as to the applicable law). Accordingly, this claim of prosecutorial misconduct during the guilt phase of trial must fail.

## XII. *JURY INSTRUCTIONS*

██ Appellant next alleges that the trial court erred in its jury instruction on an alibi defense on the basis that the instruction placed the burden on appellant with proving the truth of his alibi. Appellant asserts that because he was convicted, the jury implicitly stated that appellant failed to prove his alibi and, therefore, used this failure as evidence of his guilt.

During its jury charge, the trial court gave the following alibi instruction:

Obviously, a defendant cannot be guilty unless he was at the scene of the alleged crime. The defendant has offered Nanette Hart and Cheryl Jordan to show that he was at his father's house in Philadelphia and therefore was not present at the alleged time of death of Andrea Thomas. You should consider this evidence along with all of the other evidence in this case when determining whether the Commonwealth has met its burden of proving beyond a reasonable doubt that a crime has been committed and that this defendant committed this crime.

The defendant's evidence that he was not present at the time of death either by itself or with other evidence, if accepted by you as true, may be sufficient to raise a reasonable doubt of guilt in your mind. If you have such a reasonable doubt of the defendant's guilt, you must give the defendant the benefit of that doubt and find him not guilty.

(N.T. 8/24/94 at 400–01).

██ When reviewing a challenge to a part of a jury instruction, the Court must review the jury charge as a whole to determine if it is fair and complete. *Commonwealth v.*

*Saunders,* 529 Pa. 140, 144, 602 A.2d 816, 818 (1992). A trial court has broad discretion in phrasing its charge and can choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error. *See Commonwealth v. Prosdocimo,* 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990).

In *Saunders, supra,* this Court stated that:

An [alibi] instruction is proper if it expressly informs the jury that the alibi evidence, either by itself or together with other evidence, could raise a reasonable doubt as to the defendant's guilt and clearly directs the jury to consider this evidence in determining whether the Commonwealth met its burden of proving beyond a reasonable doubt that the crime was committed by the defendant. A charge which meets this standard would not be taken to mean that by introducing alibi evidence the defense assumed a burden of proof, which, if not met, could provide a basis for a finding of guilt.

*Saunders,* 529 Pa. at 145, 602 A.2d at 818. In this instance, the trial court's alibi instruction, when viewed as part of the entire charge, clearly meets the standard set forth in *Saunders.* In fact, we note that the trial court's instruction in this case was almost identical to the instruction this Court approved in *Saunders.*[13] Thus, the trial court did not err in its alibi instruction to the jury. Accordingly, this claim must fail.

**13.** In *Saunders,* the trial court gave the following jury charge:

Now, in this case there was also evidence of alibi. Obviously, the defendant cannot be guilty unless he was at the scene of the alleged crime. The defendant in this case has offered evidence to show that he was not present at the scene of the crime but was at another location during the time the crime was allegedly committed. You should consider this evidence along with all of the other evidence in this case when determining whether the Commonwealth has met its burden of proving beyond a reasonable doubt that a crime has been committed and that this defendant committed this crime.

The defendant's evidence that he was not present either by itself or together with other evidence may be sufficient to raise a reasonable doubt of guilt in your mind. If you have such a reasonable doubt of the defendant's guilt, you must then find him not guilty.

## XIII. *DETECTIVE MAGAZINES TO JURY ROOM*

■ Appellant next argues that the trial court erred when it allowed the detective magazines and books seized from his residence in Philadelphia, all which were admitted into evidence as Commonwealth exhibits and briefly displayed to the jury during the Commonwealth's case in chief, to be taken into the jury room during the jury's deliberations. Appellant contends that it was error because it caused the jury to place an undue emphasis on the content of the magazines than that legally permitted for the purpose for which they were admitted into evidence.

■ During trial, the Commonwealth placed eighty-one (81) detective magazines and books which contained highlighted or otherwise marked text into evidence to demonstrate that appellant's reading of these items made him familiar with methods used to eliminate inculpatory forensic evidence and to make the murder of the victim appear to be part of a random burglary by an unidentified person. This evidence was a minor part of the Commonwealth's case that only took a brief amount of time to present. Appellant's counsel, however, repeatedly emphasized these items in his closing argument by asking rhetorically how appellant could have learned forensic techniques from detective magazines and books on crime investigation. After the jury began its deliberations, the jury asked on two occasions to view the magazines. The trial court eventually granted the request and sent the magazines to the jury with the following cautionary instruction:

> The sole purpose for the introduction of the books and magazines is to determine whether a person who reads them could become familiar with police investigative technique and also as possible corroboration of the testimony of Lieutenant Woodward and the two prison inmates as to alleged statements of the defendant relating to this area of concern. The evidence may not be considered by you for any other purpose. As a matter of law, it is not illegal to read, purchase, own or possess these materials; however, you must not regard this evidence as showing the defendant

is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

(N.T. 8/24/94 at 449–50).

■ Rule 1114 of the Rules of Criminal Procedure provides that:

Upon retiring for deliberations, the jury shall not be permitted to have a transcript of any trial testimony, nor a copy of any written confession by the defendant, nor a copy of the information or indictment. Otherwise, upon retiring, the jury may take with it such exhibits as the trial judge deems proper.[14]

A trial court's decision as to which exhibits may be taken out with the jury is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Commonwealth v. Hobson*, 484 Pa. 250, 255, 398 A.2d 1364, 1366 (1979).

Here, the circumstances of this case show that the defense placed an emphasis on the seized items in his closing in order to refute the Commonwealth's theory as to why so little forensic evidence was found at the scene of the murder. Given this emphasis by the defense, we can find no abuse of discretion in the trial court permitting the magazines and books to be taken out with the jury during its deliberations upon the jury's request to view the exhibits. *See Commonwealth v. Brown*, 467 Pa. 388, 392–93, 357 A.2d 147, 149–50 (1976) (trial court did not err in allowing metal rod and wooden handle found at murder scene to be taken into the jury room where defense counsel displayed metal rod to jury during his summation and raised condition of rod as a means to refute Commonwealth's case). Moreover, any prejudice appellant may have suffered from the magazines and books being taken into the jury room during deliberations was cured by the trial court's cautionary instruction limiting the jury's usage of the items. *See Baker*, 531 Pa. at 559, 614 A.2d at 672

14. Pa. R.Crim. P. 1114 was subsequently amended on July 1, 1996. The amendment did not substantively change Rule 1114.

(jury presumed to follow trial court's instructions). Accordingly, this claim must fail.

## XIV. PROSECUTORIAL MISCONDUCT—PENALTY PHASE

Appellant's final allegation of error is that the prosecutor committed prosecutorial misconduct by making two improper remarks during his closing argument at the penalty phase of trial when urging the jury to impose the sentence of death. During the sentencing phase of a capital case, a prosecutor must be afforded reasonable latitude in arguing his position to the jury and he may employ oratorical flair in arguing in favor of the death penalty. *Commonwealth v. Basemore*, 525 Pa. 512, 528, 582 A.2d 861, 869 (1990), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992). Moreover, the prosecutor is entitled to fairly respond to evidence presented by the defendant or to closing remarks made by defendant's counsel. *Commonwealth v. Hall*, 523 Pa. 75, 565 A.2d 144 (1989).

Appellant first contends that the following remarks during the prosecutor's closing at the penalty phase were improper because he asked the jury to sentence appellant to death to prevent future molestations of women:

Does he [appellant] have a mental disease? No. Is he above average intelligence? Yes. There is nothing wrong with him. Why does the defense give you that? Not only that, Dr. Tepper [appellant's psychological expert] told you that this is a man that has emotions and anger that he represses and there is no telling when he is going to let that out. At any moment that could explode forth and somebody else is strangled, somebody else's little girl is sexually molested.

(N.T. 8/25/94 at 616). We disagree with appellant's contention.

Standing alone, such a contention may be meritorious; but here, during the penalty hearing, appellant presented his psychological expert to support the mitigating circumstance of any other mitigating factor concerning the character of appel-

lant or the circumstance surrounding the crime.[15] During his testimony, appellant's expert testified that appellant is of average to high average intelligence.[16] The expert opined that appellant is not suffering from any psychiatric disorder and is in touch with reality. The expert also testified that appellant tends to suppress his emotions. Moreover, the expert believed that if appellant were placed under too much stress, he could act on his repressed emotions. Appellant's expert admitted that if appellant acted on his repressed emotions, he could possibly sexually molest or kill other women. However, the expert opined that there were no physical symptoms present which could accurately predict whether appellant would act on his impulses.

Based on the testimony of appellant's expert, we conclude that the prosecutor's comments here did not simply ask the jury to impose the death penalty in order to prevent future sexual molestations. Rather, the prosecutor's comments were an accurate summary of the testimony given by appellant's expert and were used by the prosecutor to demonstrate why the any other mitigating factor did not apply. Therefore, the trial court did not abuse its discretion in finding that the prosecutor's comments were proper remarks which did not cause the jury to form a fixed bias or hostility towards appellant. Accordingly, this claim of prosecutorial misconduct must fail.

 The other closing statement at the penalty phase of trial which appellant claims was improper was the following statement by the prosecutor over the danger appellant could pose to prison personnel:

15. 42 Pa.C.S. § 9711(e)(8). The other mitigating factors presented to the jury were that appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1), and appellant's age at the time of the crime, 42 Pa.C.S. § 9711(e)(4).

16. While the prosecutor stated that appellant was of above average intelligence, the psychological expert claimed that appellant was of average to high average intelligence. Appellant, however, does not challenge this slight difference in the prosecutor's summation of the evidence. However, we note that the trial court instructed the jury in its general instructions that the prosecutor's arguments are not evidence.

How many other people must die when he can't control his impulses? How do we know he is not going to be able to control it and some prison guard is walking there, doesn't know what is going on, and the next thing you know he is dead; or some other guy he's in prison with or somebody who is visiting. How do we know he won't be able to control that impulse? Dr. Tepper doesn't know and he's an expert. He can't tell you what to look for.

(N.T. 8/25/94 at 620). This argument was a fair inference which could be drawn from appellant's psychological expert testimony that appellant repressed his feelings and that when stressed, appellant is prone to outbursts of aggression because he cannot control these repressed feelings. After reviewing these particular remarks, as well as the remainder of the prosecutor's closing arguments, we are convinced that appellant was not unduly prejudiced by this portion of the prosecutor's closing argument so as not to receive a fair penalty hearing. *See Commonwealth v. Griffin*, 537 Pa. 447, 460–63, 644 A.2d 1167, 1174–75 (1994) (prosecutor's comment to impose death penalty in order to protect prison personnel not improper when made in response to defendant's counsel's argument that defendant not a danger to community). Accordingly, this claim of prosecutorial misconduct during the penalty phase of trial must fail.

## XV. *INDEPENDENT REVIEW OF SENTENCE OF DEATH*

 Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the

circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).

After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. In addition, we further find that the evidence was sufficient to establish the aggravating factor found by the jury that appellant had been convicted of another murder before the time of the offense at issue since he pled guilty to third degree murder in 1981 for the death of Karen Stubbs.

Moreover, in accordance with *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 961 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983), we must conduct a proportionality review as to appellant's sentence of death. Here, since the jury found one aggravating circumstance and no mitigating circumstances, the jury was statutorily required to impose a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv). Since the sentence of death was mandatory, we have conducted an independent review of similar cases in which the sentence of death was made mandatory by the finding of at least one aggravating factor and no mitigating circumstances and conclude that the sentence of death imposed upon appellant is not disproportionate to the sentences imposed in similar cases. *See Commonwealth v. Brown*, 544 Pa. 406, 676 A.2d 1178 (1996); *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293 (1996).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant, Thomas W. Hawkins, by the Court of Common Pleas of Montgomery County.[17]

ZAPPALA, J., files a dissenting opinion in which FLAHERTY, C.J., joins.

17. Within ninety (90) days of the date the sentence of death is upheld by this Court, the Prothonotary of this Court is directed to transmit to the governor's office the full and complete record of the trial, sentencing

ZAPPALA, Justice, dissenting.

I would vacate the judgment of sentence and remand the case for a new trial because the trial court erred in allowing the jury to view the contents of 81 detective magazines. The magazines had been seized from Hawkins' residence pursuant to the execution of a search warrant related to the disappearance of a woman in a case unrelated to this case. The Commonwealth introduced the detective magazines for the purpose of showing that Hawkins had extensive knowledge of police techniques.

The Commonwealth asserts that the magazines were relevant to the issue of the identity of the killer of Andrea Thomas because the killer was someone familiar with police investigation, techniques, and procedures. The Commonwealth bases this assertion on the fact that evidence found at the crime scene indicated that the murderer attempted to divert the attention of the police by making it appear as if the killing had happened in the course of a burglary. The Commonwealth claims that Hawkins had staged a phony burglary scene in the victim's home and left virtually no forensic evidence. It asserts that the absence of forensic evidence suggested that the murderer knew enough about police forensic techniques to be aware of the danger of even leaving trace evidence.

The magazines apparently had been marked on different pages, but the parties had stipulated that the magazines had been retrieved from the trash by Hawkins and there was no proof that the pages had been marked by him. During closing argument, defense counsel asked rhetorically how Hawkins could have learned forensic techniques from reading magazines. Twice during its deliberations, the jury asked the court if it could see the magazines. After the second request, the court permitted the jury to take the magazines into the jury room.

A cautionary instruction was given to the jury concerning the purpose of admitting the magazines into evidence. The

hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).

court indicated that the sole purposes for the introduction of the magazines were to determine whether a person who reads them could become familiar with police investigative techniques, and as possible corroboration of testimony given by a police lieutenant and the two prison inmates as to alleged statements of Hawkins that he had learned about police techniques by reading detective magazines.

The Commonwealth argues that the court did not decide to send the magazines out with the jury until trial counsel had opened the door to the issue of their contents and after two requests by the jury to see the magazines. The decision to permit a jury to examine exhibits during deliberations is committed to the trial court's discretion and will not be reversed absent an abuse of that discretion. *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129 (1996). Where the probative value of properly admitted evidence outweighs its prejudicial value, there is no abuse of discretion. *Id.*

Since the actual contents of the magazines were never admitted into evidence, and the Commonwealth had stipulated that there was no proof that Hawkins had marked certain pages in the magazines, the prejudicial impact of the evidence clearly outweighed its probative value. The magazines contained highlighted or marked text regarding murders by strangulation, stabbing or clubbing combined with sexual assault. When the jury was given the opportunity to review the contents of the magazines with descriptions of similar murders involving sexual assault, extraneous information unrelated to the charges against Hawkins may have been considered in determining whether he was guilty of first degree murder.

A conviction must be based on evidence of the crime allegedly committed, not on similar dramatized or fictionalized crime events detailed in magazines. I do not agree with the majority that the cautionary instruction given to the jury was adequate to overcome the prejudicial effect of the jury's examination of the magazines. The trial court clearly abused its discretion in allowing the jury to consider information contained in the magazines themselves.

FLAHERTY, C.J., joins this dissenting opinion.